**Floyd NICHOLAS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1321.**

Supreme Court of Alaska.

Dec. 11, 1970.

---

David Backstrom, Asst. Public Defender, Fairbanks, for appellant.

Thomas Keever, Asst. Dist. Atty., Fairbanks, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

## OPINION

ERWIN, Justice.

This is an appeal from a sentence of two years' imprisonment imposed on appellant for his conviction upon his plea of guilty to the crime of sale of marijuana in violation of AS 17.12.110.

In the recent case of State v. Chaney, 477 P.2d 441 (Alaska 1970), this court noted that the following objectives are included within the goals of Alaska constitutional provisions concerning penal administration: [1]

Within the ambit of this constitutional phraseology are found the objectives of rehabilitation of the offender into a non-criminal member of society, isolation of the offender from society to prevent criminal conduct during the period of confinement, deterrence of the offender himself after his release from confinement or other penological treatment, as well as deterrence of other members of the community who might possess tendencies toward criminal conduct similar to that of the offender, and community condemnation of the individual offender, or in other words, reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves. (footnote omitted).[2]

To make a reasoned sentence decision, the sentencing judge must determine the priority and relationship of these objectives in any particular case.[3]

While unjustifiable disparities in the sentencing of criminal offenders may be a serious problem to many observers of the criminal process, the key word is "unjustifiable", for reasonable disparity is necessary to achieve the purposes of sentencing. Some range of sentencing alternatives must be provided to allow adjustment for the special facts of each crime as well as the record and character of each convicted individual.[4]

It should be clear at the outset that the standard of review concerning the exercise of sentencing discretion by the trial judge requires of necessity a broad view, for it is not the purpose of appellate review to enforce uniformity or to chill initiative on

---

1. Alaska Const. art. I § 12 provides in part: "Penal administration shall be based on the principle of reformation and upon the need for protecting the public."

2. 32 F.R.D. 249, 258 (Symposium of Appellate Review of Sentences, 2nd Cir. 1962). See ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Sentencing Alternatives and Procedures, § 2.5(c) (Approved Draft 1968); Model Penal Code, § 2.5, art. 7 (1962).

3. Note, Appellate Review of Primary Sentencing Decisions: A Connecticut Case Study, 69 Yale L.J. 1453, 1455 (1960);

Chapter V, Guides for Sentencing by National Council on Crime and Delinquency (1957).

4. Weigel, Appellate Revisions of Sentences: To Make the Punishment Fit the Crime, 20 Stan.L.Rev. 405 (1968); Mueller and Poole, Appellate Review of Legal But Excessive Sentences: A Comparative Study, 21 Van.L.Rev. 411, 412 (1968); ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Appellate Review of Sentences, § 1.2 at 29–30 (Approved Draft 1968) (hereinafter cited as Standards Relating to Appellate Review of Sentences).

the part of the trial judge in attempting to arrive at a proper sentence. As explained by Judge Lawrence E. Walsh, an opponent of sentence review, there is a possibility of harm from the very act of review itself in that all judges may attempt to arrive at a happy medium rather than attempting through the personal initiative, experience and training peculiar to trial judges to formulate a program best suited to the individual in view of his background and the nature of the crime.[5]

This court recognizes that the primary responsibility for sentencing must remain with the trial judge. The objectives of sentence review will be achieved only if the sentence that is initially fixed is based on the conscientious effort of the trial judge to arrive at the sentence which best suits the case at hand.[6]

But respect for the discretion of the trial judge will not prevent this court from making our own examination of the record and we will modify the sentence if we are convinced that the sentencing court was clearly mistaken in imposing the sanction it did.[7]

---

5. "The answer is that this proposal won't eliminate intemperance; it will eliminate severity. Now it may be, as I've said, that severity is a bad thing. People of good faith can differ on this, but I can tell you that no judge is going to go out on a limb with a heavy sentence, no matter how badly deserved, if he is going to be reviewed and if the outcome of that review can be a conclusion that he's sadistic, that he's vicious or savage, or whatever else you want to call it, *even if there's dissenting opinion* * * *. It doesn't make a judge willing to go out on a limb the next time. And then there's the other thing. I mean as we moderate and get toward this happy medium and get all these 400 judges, who have their own odd personal ideas about what's good for the community—if we get them homogenized and put them down towards the median sentence, Congress will have something to say about this and we'll end up with more mandatory sentences. * * * *" Remarks of the Hon. Lawrence E. Walsh before the Judicial Conference of the Second Circuit, 32 F.R.D. 276, 281 (1962).

6. An argument often advanced against appellate review is that the appellate court is in no position to review sentences because it has no opportunity to observe *the attitude of the defendant and make a* personal assessment of his character. The point is, of course, valid in a few cases, especially where there has been a long trial at which the defendant testified. Clearly, the trial judge has had an opportunity which is entitled to weight in reviewing the correctness of that sentence and this is a factor which will be weighed by the appellate court in review in those particular cases. Unfortunately, there *is often little opportunity in the great*

majority of cases for the sentencing judge to observe the demeanor of the defendant where he pleads guilty, for such contacts are limited in time and scope and both the sentencing and reviewing court are in a similar position. *See* Note, Applate Review of Primary Sentencing Decisions: A Connecticut Case Study, 69 Yale L.J. 1453, 1465, nn. 65 & 66 (1960); Sobeloff, The Sentence of the Court: Should There Be Appellate Review, 41 ABA J. 13 (1955).

7. *See* State v. Chaney, 477 P.2d 441 (Alaska 1970). The background of AS 12.55.-120 is expressed by the Alaska State Legislature in the House Judiciary Committee Report which specifically notes broad powers of review:

> This bill draws on the concepts for appellate review of criminal sentences contained in proposed federal legislation. Such legislation is expected to be enacted into law during the 1969 session.

> The majority of the courts have held that where a sentence imposed by a trial judge is within the limits prescribed by statute and otherwise legal, an appellate court cannot review the discretion of the trial judge exercised in determining the sentence, even though it may appear in retrospect to have been too severe or too lenient.

> Enactment of House Bill No. 281 would provide the jurisdiction and substantive guidelines required to provide for appellate review of sentences in Alaska. The supreme court of Alaska would promulgate detailed rules of procedure providing for the preparation and forwarding of the record, hearing procedures, etc. In general, it is expected that these rules would be identical with those proposed to implement the federal legislation. * * *

In the case at bar, appellant was indicted in March of 1969 on two counts: Count I alleging the sale of marijuana and Count II the sale of LSD. The appellant pled guilty to sale of marijuana and the second count was dismissed. While appellant had no prior convictions, there is an indication in the presentence report that he had psychiatric problems and the probation officer, the district attorney, and the defense counsel all agreed on a recommended sentence of probation provided that the appellant be given psychiatric counseling and that the appellant maintain employment or full-time school.

The appellant was 22 years of age at the time of sentencing, had been born near Galena, Alaska, and had resided in a series of foster homes almost from the time that he had been 3 years old until he had reached the age of majority. The appellant had done sufficiently well in high school to obtain a Bureau of Indian Affairs scholarship to the University of Alaska where his record can only be characterized as spotty. He flunked out of the University of Alaska in two separate occasions, but was able to complete approximately 27 credit hours of course work.

The appellant spent the first half of the year 1968 in and around the Fairbanks area working at janitorial work and fire-fighting in the summer and living with friends and acquaintances for short periods of time. In September of 1968 he again returned to the University of Alaska on a probationary basis and was supported by the Bureau of Indian Affairs for the third time but was not able to pro-cure the necessary average to remain at the University of Alaska. After the time of the offense herein, the appellant was living in an apartment by himself which was paid for by the Bureau of Indian Affairs and he was working for the University of Alaska as a fire watch guard in the new library, a position which was obtained through the assistance of the probation office. Previous to this period of time, after leaving the University, the subject had been floating around, staying at different friends' homes, borrowing money and not working.

The employment history of the defendant is very inconsistent. He showed very little responsibility, often failing to show up on time or notify his employer when he was unable to come to work, and as a result was unable to continue for any period of time in any job.

The offense in question here was committed on March 1, 1969, at 1:15 a. m. at the International Coffee Shop in Fairbanks. Nicholas approached the table at which his employer at that time, Charles Gilford, Investigator McCoy of the Alaska State Troopers, Investigator Robert Lee, and Investigator Joseph Turner were seated. The conversation was at first general and then switched to narcotics in the Fairbanks area and the appellant stated that he could get any kind of narcotics they wanted. He was asked if he could get some hashish and he replied that he had some on him and he reached into his left pocket and pulled out a substance which later proved to be marijuana. A sale was consummated for $10 and the

Judiciary Comm. Report on House Bill 281, Journal of the Alaska House of Representatives at 665 (1969).

At the time that the Alaska act was passed, two rather comprehensive studies of appellate review of sentences had been undertaken, see Standards Relating to Appellate Review of Sentences (Tentative Draft 1967); Standards Relating to Appellate Review of Sentences (Approved Draft 1968), and at least two federal sentencing conferences had been held.

See Sentencing Institute, Ninth Circuit, 39 F.R.D. 523 (1965) ; Sentencing Institute, Second Circuit, 41 F.R.D. 467 (1956). The standards thus proposed and which apparently were adopted by the legislature of Alaska in promulgating AS 12.55.120 provided for an independent review of the record to ascertain whether or not a sentence is clearly mistaken. See Standards Relating to Appellate Review of Sentences, § 3.1 (Approved Draft 1968).

substance changed hands. Nicholas was then asked by Investigator Robert Lee if he could get acid and Nicholas replied, "Sure, do you want some?" The investigator, Lee, asked how much, and Nicholas replied "$2.50." Upon receipt of the money, Nicholas reached into his pocket and gave him a tablet which he stated was LSD.

Several different personal references were obtained from Nicholas and were interviewed by the Division of Corrections, and all of the references spoke very highly of him.

At the sentencing hearing on June 12, 1970, all of these facts were brought out at some length and all participants at the hearing, the State, the Division of Corrections and the Public Defender, recommended a sentence of four years to be suspended with the defendant to be placed on probation providing for either steady work or full-time school activity. The court, after considering the whole matter, noted that it did not agree with the conclusion of the report, and pointed out that the offense was a serious one and that there was nothing in the background of the defendant that would indicate that supervised probation would lead the defendant into a realization of the incorrectness of his behavior:

Well, I've read the report here—the probation officer's report and I—I can't agree with the conclusions that it reaches. In the first place, the amount of effort that communities are expending and have been expending for several years in trying to suppress or do what they can to reduce this drug traffic has been intense enough to become matters of common knowledge to almost anybody and I can only conclude that somebody who'd fly dead into the face of something like that must necessarily have little or no respect to the law.

I regard it as something more than the—actually just the garden variety, the run of the mill, anymore, of our criminal statutes. I don't think this court has the panic in it as to the threat of what drugs are but it was more the attitude of the communities generally that certainly should suggest to anyone of average intelligence and according to this psychiatric report. Doctor examining this young man thought that he was highly intelligent. So I can only conclude that he perceives and did then perceive those things which people normally would do. I'd suggest that in this report that this is just a happenstance, experimental first occasion involvement. I suggest that this is hard for the Court to accept in view of the fact that the matter of drugs comes up and I—in the matter of being able to supply them, and have you got any hashish and—it just so happens that this defendant had some of that. And do you have any LSD? Well, it just so happens that he had some of that. Well, people just don't go carrying around hashish and LSD and other kinds of drugs, if there were others, and two out of two he was able to supply, in their pockets, spare just as a flyer.

I look at the background of this young man, find that he just floated around. He has made three or four attempts to try to stay in school. He's went from job to * * * job to job. I don't find anything there that recommends him. It's for these reasons that I cannot agree with the conclusions reached by the Division of Corrections.

In this particular case, the trial judge felt that the protection of the public, the very nature of the crime itself, the fact that the defendant had in his possession more than one type of drug indicating that this was not a chance transaction, and an existing community problem with sale and possession of dangerous drugs, taken together with the defendant's background which showed neither permanent ties in the community nor any serious desire either to work or to go to school, were sufficient to overcome any possible

advantage of probation. It would appear that the trial judge attempted to balance the various factors inherent in sentencing in arriving at a sentence of two years. While the reasons given are less than precise,[9] we are not convinced the trial court was clearly mistaken in imposing the sentence it did. Therefore, the sentence imposed by the superior court is affirmed.

9. The trial judge did not discuss the relative merit of probation and imprisonment for rehabilitation purposes, or the likelihood of further criminal conduct by the appellant. While some of this information may be inferred from the record, it would be helpful to this court in reviewing sentences that these areas be specifically discussed by the sentencing judge.