**David W. PICKARD, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–6875.**

Court of Appeals of Alaska.

Oct. 16, 1998.

---

66. Op. at 739.

·Tracy Shikles, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

James J. Fayette, Assistant District Attorney, Susan A. Parkes, District Attorney, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, C.J., and
MANNHEIMER and STEWART, JJ.

MANNHEIMER, Judge.

In this appeal, we are asked to review David W. Pickard's sentence for third-degree assault. This offense is a class C felony with a maximum sentence of 5 years' imprisonment. Pickard, who is a first felony offender, received a sentence of 5 years with 1 year suspended (4 years to serve)—a sentence that exceeds the 3-year presumptive term for a third felony offender. Pickard contends that this sentence is excessive. However, as explained below, we conclude that the sentence is justified by the facts of Pickard's case and by Pickard's history of re-

peated serious violence against the same victim.

On August 6, 1997, Pickard attacked his ex-wife, L.P.. Pickard was angry because he could not find his wallet; he had in fact misplaced it, but he believed that L.P. had stolen it. Pickard threw his ex-wife to the floor, and then he grabbed a knife from the kitchen cutlery block. Climbing on top of L.P. with the knife in his hand, he straddled her torso and announced that he was going to kill her.

Pickard repeatedly stabbed at L.P.'s head and chest. L.P. was able to ward off these blows with her hand. (She sustained several cuts in the process.) Fortunately, L.P.'s son entered the room at this point. When he screamed for Pickard to stop, Pickard broke off his attack and got off L.P.

L.P. immediately went to the telephone, intending to call the police, but Pickard grabbed the telephone from her, tore the cord from the wall, and threw the handset into another room. He then kicked L.P., again knocking her to the floor. Pickard climbed on top of L.P. and punched her several times in the face. Having done this, Pickard got up and began to cry. L.P. got to her feet, retrieved the telephone, and summoned the police.

Based on this conduct, Pickard was charged with second-degree assault and interfering with a report of a crime involving domestic violence.[1] These charges were dismissed when Pickard agreed to plead no contest to third-degree assault.[2]

Pickard had a history of domestic violence against L.P.. In 1990, he was convicted of four counts of fourth-degree assault for conduct that apparently would have supported more serious charges. These four convictions stemmed from a series of incidents that began on April 5, 1990.

On the afternoon of April 5th, Pickard came home drunk, tore off L.P.'s underclothing, and announced that "[he] could rape [her] if [he] wanted to". He then threatened to kill L.P. and their four-month-old son.

After making these threats, Pickard went to the infant's crib, picked up the infant, and—holding his hand to the child's throat—he announced that he was going to kill the child and make L.P. watch. L.P. grabbed a pair of scissors and stabbed Pickard; then she picked up the telephone to call the police. Pickard (who was not seriously hurt) tore the receiver from L.P.'s hand and struck her in the head with it. L.P. then fled to a neighbor's house.

Based on this incident, L.P. obtained a restraining order against Pickard. However, the two of them reconciled within days, and Pickard moved back in.

On the afternoon of April 17th, L.P. again contacted the police—this time, from the emergency room of Humana Hospital. The incident began the previous day (April 16th), when Pickard came home after attending a "male awareness" class. Pickard brought a twelve-pack of beer home with him, and as he drank he became upset. Pickard told L.P. that he wanted a divorce. When she readily agreed to this, Pickard became even more upset. L.P. called the Anchorage police, and officers came to the home. Pickard left the residence, but he returned after the police left.

Upon his return, Pickard threatened to kill L.P.. She again summoned the police. When the officers arrived, Pickard convinced them that he would willingly leave the residence as soon as he collected his clothes; the officers departed in reliance on this promise. However, soon after the officers left, Pickard announced that he was going to kill the baby.

As Pickard started walking toward the child's room, L.P. blocked his path. Pickard knocked her to the floor. He then grabbed L.P.'s left leg and smashed it against a door and the wall until he heard her bones break. Having immobilized L.P., Pickard went downstairs, obtained a filleting knife from the kitchen, and returned to his wife. He threatened to maim her and kill her. He then forced her downstairs, where he held her prisoner for three hours. During these hours, Pickard threatened to sexually assault

---

**1.** AS 11.41.210(a)(1) and AS 11.56.745(a), respectively.

**2.** AS 11.41.220(a)(1)(B).

her, and he ran the point of the knife across her face, her torso, and her crotch.

Despite her broken leg, L.P. made three attempts to escape. The first two times, Pickard caught her and struck her repeatedly in the torso and the crotch. On the third attempt, L.P. managed to get to a neighbor's yard, where she screamed for help. Pickard grabbed her and knocked her to the ground, but by then he was calming down. He began telling L.P. how much he loved her; he then turned around, walked back into the house, and went to bed. L.P., too, went back into the house, where she stayed awake all night to protect her baby. Pickard went to work the next day. L.P. found the phone, called AWAIC (a shelter for abused women), and arranged transportation to the shelter. When shelter personnel observed L.P.'s injuries, they took her to the hospital emergency room for treatment.

Even though Pickard's conduct apparently could have supported more serious charges, he was convicted of four counts of fourth-degree assault. He received a sentence of 360 days' imprisonment with 240 days suspended (120 days to serve), and he was ordered to complete both male awareness training and alcohol treatment.

In 1995, Pickard was again convicted of criminal offenses stemming from acts of violence against L.P., who by now was divorced from him. On the afternoon of December 21st, Pickard came to L.P.'s apartment; he was picking her up so they could go shopping together for Christmas gifts for their child. After shopping, the two of them went to a bar for a few drinks. Returning from the bar, Pickard tried to convince L.P. to leave her current boyfriend. An argument ensued. Pickard told L.P. to "shut up or he would ram the car into a snow bank". When L.P. continued to argue with Pickard, he did indeed run the car into a snow berm along the New Seward Highway.

Pickard got out of the car and started yelling. L.P. decided to stay inside the car, away from Pickard, so she locked all of the doors. Seeing what L.P. had done, Pickard

tried to get back inside the car: he broke the side-view mirror and the window on the passenger's door. A passerby stopped and gave L.P. a ride to the police station.

After explaining to the police why she was there, L.P. took a cab back to her apartment. She found Pickard and her boyfriend waiting for her there. Pickard resumed his argument with L.P.; as he became more worked up, he went to the kitchen and grabbed a knife. Pickard held the knife to L.P.'s throat and threatened to kill her. He then threw the knife in a corner. L.P. went into the kitchen to get a glass of water. Pickard followed her, took the glass from her, broke it, and then held one of the shards against her throat, again threatening to kill her. At this point, L.P.'s boyfriend went next door and summoned the police.

Pickard was originally charged with two counts of third-degree assault, but these charges were dismissed in favor of two misdemeanors: fourth-degree assault and third-degree criminal mischief. Pickard was sentenced to 360 days' imprisonment with 200 days suspended (160 days to serve), and he was again ordered to enter alcohol treatment. Pickard was on probation from these 1995 convictions when he committed the assault in the present case.

Pickard's present offense, third-degree assault, is a class C felony.[3] The maximum sentence for this crime is 5 years' imprisonment, and the presumptive terms for second and third felony offenders are 2 years and 3 years, respectively.[4] Pickard was a first felony offender, but the State asked the superior court to impose a sentence of greater than 2 years to serve (the presumptive term for second felony offenders). In support of that request, the State alleged four aggravating factors under AS 12.55.155(c): (c)(8)—that Pickard's criminal history included aggravated or repeated instances of assaultive behavior; (c)(10)—that Pickard's offense was among the most serious within the definition of third-degree assault; (c)(18)(A)—that Pickard's offense was a felony committed

3. AS 11.41.220(d).

4. AS 12.55.125(e).

against a former spouse; and (c)(21)—that Pickard had a history of similar offenses.[5]

Pickard conceded aggravators (c)(8), (c)(18)(A), and (c)(21), but he disputed aggravator (c)(10). The State argued that Pickard's offense was among the most serious third-degree assaults because Pickard had actually committed second-degree assault as defined in AS 11.41.210(a)(1); that is, the State asserted that Pickard, acting with intent to injure his ex-wife, had caused injury to her by means of a dangerous instrument (the knife). The defense attorney disputed the State's characterization of the event; she argued that, even though Pickard might have acted recklessly, the evidence did not show that Pickard acted with intent to inflict injury.

Superior Court Judge Milton M. Souter concluded that the State had proved aggravator (c)(10). The judge noted that, when Pickard attacked his ex-wife, Pickard declared that he intended to kill her. Based on Pickard's statement and the conduct that accompanied that statement, Judge Souter concluded that Pickard's offense

> clearly is a most serious instance of assault in the third degree. In fact, it's substantially above that. I think it's above [second-degree] assault. I think it's probably closer to attempted murder than it is to anything else—swinging a knife around like that, [coupled] with a statement that he intends to kill.

Pickard does not challenge Judge Souter's finding on appeal.

Having found these four aggravating factors, Judge Souter advised the parties that he considered Pickard's case "extraordinarily aggravated". The judge noted that Pickard had had problems with his temper since he was a youngster. Pickard had received repeated treatment for alcoholism and for anger management, and yet he was back in court a third time for assaulting the same victim, his former wife.

THE COURT: This defendant has done this before. His behavior on this occasion, as well as [on the] two prior occasions, was outrageous. There was an expressed intent to kill this time. He had a weapon in his hand again this time that could have killed the ... victim[.]

It's obvious to me that the defendant has got some sort of ... emotional health problem that underlies this. He's got some kind of horrible, deep-seated anger against women—maybe against children too, I don't know. And when he drinks, [it pops] out; he's not able to hold it in. The alcohol removes his inhibitions, and out it comes. And he's not able to stop drinking; ... he is an alcoholic.

Judge Souter declared that Pickard was a man "[with] a short fuse [that] is quite easily lit, and at the end of that fuse is something very explosive." The judge noted that prior rehabilitative programs had failed to alter Pickard's violent behavior and that probation had not been sufficient to restrain that behavior. Judge Souter also stated that he did not have much optimism about Pickard's chances for rehabilitation or his ability to control himself once the criminal justice system's controls were removed. The judge concluded that, if Pickard was released, his ex-wife and at least one of his children would be "in extreme danger". In sum, Judge Souter declared, Pickard's case was "the domestic violence case from Hell, ... and it needs to be treated with the seriousness that that [characterization] suggests."

Based on these findings, Judge Souter imposed a sentence of 5 years with 1 year suspended—4 years to serve.

On appeal, Pickard first asserts that Judge Souter violated the rule announced in *State v. Wortham*[6] by imposing a maximum sentence without finding that Pickard was a "worst offender".[7] This argument lacks merit. Al-

---

**5.** *See* AS 12.55.125(k); *Brezenoff v. State,* 658 P.2d 1359, 1362 (Alaska App.1983); *Austin v. State,* 627 P.2d 657, 657–58 (Alaska App.1981) (in the absence of statutory aggravating factors or extraordinary circumstances, a first felony offender must receive a sentence more favorable than the presumptive term established by the legislature for a second felony offender convicted of the same crime).

**6.** 537 P.2d 1117 (Alaska 1975).

**7.** *Wortham,* 537 P.2d at 1120; *Napayonak v. State,* 793 P.2d 1059, 1062 (Alaska App.1990).

though Judge Souter sentenced Pickard to 5 years' imprisonment, he suspended 1 year of this sentence. Under Alaska case law, this is not a maximum sentence.[8]

■ Pickard argues that Judge Souter did not place sufficient emphasis on the sentencing goal of rehabilitation. But a sentencing judge bears primary responsibility for determining the priority and relationship of the various sentencing goals in each case.[9] In Pickard's case, Judge Souter expressly considered Pickard's potential for rehabilitation, and he found little reason to expect a change in Pickard's behavior. Based on Pickard's prior similar offenses, Pickard's repeated failed efforts at rehabilitation, and Pickard's repetition of domestic violence while on probation, Judge Souter concluded that Pickard's sentence should emphasize other sentencing goals—most notably, isolation, deterrence, and reaffirmation of societal norms. We will not disturb Judge Souter's decision unless it is clearly mistaken.[10]

Having reviewed the record, we conclude that Judge Souter was not clearly mistaken in emphasizing sentencing goals other than rehabilitation. With particular regard to the sentencing goal of isolating a defendant to protect the public, we have stated that this goal

comes into play primarily in cases involving offenders who have established themselves to be particularly dangerous and incapable of rehabilitation, thereby demonstrating the need for prolonged incarceration in the interest of public safety.[11]

Although this is Pickard's first felony conviction, his history of assaults and failed rehabilitative efforts, coupled with the facts of his present offense, all support Judge Souter's decision to emphasize the sentencing goals of isolation, deterrence, and reaffirmation of societal norms rather than rehabilitation.

■ Lastly, Pickard argues that his sentence violates what Alaska cases have termed the "principle of parsimony"—the notion that a criminal sentence should be no more severe than necessary to accomplish the objectives of sentencing codified in AS 12.55.005.[12] Pickard points out that his prior sentences for domestic violence were considerably shorter—120 days to serve in 1990, and 160 days to serve in 1995. He argues that "lesser attempts at deterrence should precede harsher attempts", and therefore, although he might now deserve a more severe sentence than the ones he received in the past, he nevertheless should have received something shorter than 4 years to serve.

■ The principle of parsimony does not convert appellate sentence review into a sentencing de novo. Sentence review is still conducted under the "clearly mistaken" standard—the principle that there is a range of reasonable sentences that will not be disturbed on appeal.[13] The principle of parsimony does not supersede this legal doctrine; rather, it declares that, "to the extent that there is any doubt [concerning the appropriateness of a defendant's sentence], that ... doubt [should] be resolved in favor of a shorter, rather than a longer, sentence."[14]

Pickard was forty-one when he was sentenced in this case—not a youthful offender. He has been convicted twice before of assaulting his ex-wife—assaulting her in ways remarkably similar to the present offense. Despite his past convictions, his past probations, and his past rehabilitative treatments, Pickard has continued to engage in serious, explosive, and unreasoning violence upon his former wife.

8. See Linne v. State, 674 P.2d 1345, 1357 (Alaska App.1983); Wertz v. State, 611 P.2d 8, 10 (Alaska 1980); Ferreira v. State, 602 P.2d 803, 806 (Alaska 1979).

9. Asitonia v. State, 508 P.2d 1023, 1026 (Alaska 1973).

10. Nicholas v. State, 477 P.2d 447, 448–49 (Alaska 1970).

11. State v. Huletz, 838 P.2d 1257, 1260 n. 2 (Alaska App.1992).

12. See Pears v. State, 698 P.2d 1198, 1205 (Alaska 1985).

13. See State v. Wentz, 805 P.2d 962, 965 (Alaska 1991).

14. State v. Price, 740 P.2d 476, 483 (Alaska App. 1987).

As explained above, although Pickard was convicted of only misdemeanors for his prior assaults on L.P. and their child, his underlying conduct could have supported felony assault convictions. Speaking of Pickard's prior convictions and sentences, Judge Souter declared that Pickard "[had] been treated much too leniently in the past". The judge also found that Pickard would, for the foreseeable future, continue to present a grave danger to his ex-wife unless he was actively restrained. Given Judge Souter's findings regarding Pickard's level of dangerousness and questionable prospects for rehabilitation, and the consequent need to isolate and deter Pickard, a substantial term of imprisonment does not violate the principle of parsimony.[15]

█ Moreover, we conclude that Judge Souter could properly emphasize the need to re-affirm societal values in cases like Pickard's. As noted above, Judge Souter found that Pickard's case was extraordinarily aggravated. Although Pickard was a first felony offender, his criminal history encompassed repeated armed assaults on his ex-wife. Not only did these assaults result in injury to his wife, but they were, almost without exception, accompanied by threats to kill her (and, on one occasion, to kill her child as well). Both the Alaska Legislature and this court have recognized that domestic violence such as this represents a serious danger to its victims and a significant harm to society at large.

Under AS 12.55.155(c)(18)(A), a felony assault is aggravated if it was committed against the defendant's spouse, the defendant's former spouse, or any other member of the defendant's household. By enacting this aggravating factor, the legislature has declared that felony assaults against spouses and former spouses are to be considered atypically serious (all else being equal). We further note that the legislature has limited the civil compromise statute, AS 12.45.120(5), so that the victims of misdemeanor domestic assaults can no longer reconcile with their attackers and then demand dismissal of the criminal charges.

Both of these legislative actions embody the same concern over domestic violence that this court expressed in *State v. Huletz*.[16] In *Huletz*, we recognized that assaults involving domestic violence

> occur with alarming frequency in our society, often having devastating consequences. When a court imposes a mitigated sentence in a domestic assault case that is not particularly mitigated, it unduly depreciates the seriousness of this type of criminal misconduct: such a sentence inevitably creates the impression that domestic violence is a form of assault which is somehow less worthy of societal condemnation (and therefore somehow less serious) than other forms of assault. The appearance that the justice system deems domestic assaults to be trivial can only be exacerbated when unusually lenient treatment is accorded to an offender with a prior criminal record.

*Huletz*, 838 P.2d at 1260–61.

In *Huletz* we also recognized the pervasive harm that domestic violence works on our society:

> A woman is beaten every 18 seconds and 4,000 battered women are killed every year in the United States. Nationwide, more than one million abused women each year seek medical assistance for injuries caused by battering. In Alaska, 26% of adult women have been physically abused by a spouse sometime during their lives and most of the battered women were abused at least once a month. It is estimated that a minimum of 13,200 women living in Alaska have required medical treatment by a doctor or hospital for injuries sustained by abuse at some time in their life. In 1990, fifty percent of female murder victims in Alaska were killed by their husbands or boyfriends. More than half of all homeless women are on the street because they are fleeing domestic violence.

*Huletz*, 838 P.2d at 1260 n. 3, quoting the 1992 annual report of the Alaska Council on

---

**15.** *See Newell v. State*, 771 P.2d 873, 876 (Alaska App.1989).

**16.** 838 P.2d 1257 (Alaska App.1992).

Domestic Violence and Sexual Assault (March 1992), page 2.

. In sum, although Pickard's sentence is concededly severe for a first felony offender, we conclude that the record in this case adequately supports that sentence. We do not find Pickard's sentence to be clearly mistak-en.[17] Accordingly, the sentencing decision of the superior court is AFFIRMED.

**17.** *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).