258 P.3d 893 (2011)
Adam ISRAEL, Appellant,
v.
STATE of Alaska, Appellee.
No. A-9928.
Court of Appeals of Alaska.
June 29, 2011.
*894 Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, and Adam Israel, in propria persona, Hudson, Colorado, for the Appellant.
Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.
Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

MEMORANDUM OPINION
MANNHEIMER, Judge.
Adam Israel was convicted of second-degree murder for stabbing and killing his mother, Dorothy Israel. He received a sentence of 60 years' imprisonment with 20 years suspended (40 years to serve).
In this appeal, Israel contends that the superior court should have granted his request to dismiss the Public Defender Agency and allow him to represent himself at trial. Israel also contends that the superior court improperly allowed the State to introduce evidence of an altercation that occurred approximately one week before the homicide, during which Israel threatened his mother. In addition, Israel argues that his trial judge, Superior Court Judge Charles T. Huguelet, was biased against him and should have been disqualified from hearing Israel's case. Finally, Israel argues that his sentence is excessive.
For the reasons explained in this opinion, we find that none of these claims has merit, and we therefore affirm Israel's conviction and sentence.

The superior court's refusal to allow Israel to represent himself
Under both the federal Constitution and the Alaska Constitution, criminal defendants have the right to waive the assistance of counsel and represent themselves.[1] However, a trial court has the authority to reject a defendant's request for self-representation if the defendant is not capable of presenting their case in a rational and coherent manner,[2] or if the defendant is not capable of conducting their defense without being unusually disruptive.[3]
Judge Huguelet rejected Israel's request for self-representation because he concluded that Israel was not capable of controlling himself in the courtroom. As we are about to explain, we conclude that the record supports Judge Huguelet's ruling.
Israel was initially represented by Assistant Public Defender Brooke Browning. In July of 2005, Judge Huguelet held a hearing on Israel's request to have Browning withdraw from his case.
At this hearing, Israel told Judge Huguelet that Browning did not communicate adequately with him, and that Browning had not done enough work on his case. Israel also declared that Browning had told him that she used marijuana (a charge that Browning denied). Israel said that if he had to choose between having Browning represent him and having no attorney at all, he would choose to represent himself. He told the judge, "I'll just plead out [i.e., plead guilty] . . . if I have to keep [Browning]." When Judge Huguelet responded that Israel should not plead guilty for this reason, Israel indicated that he wanted to plead guilty rather than have Browning represent him, and he told Judge Huguelet, "You can give me the max[imum penalty], okay? . . . [I]t doesn't matter to me."
During this discussion, Israel had a hard time waiting his turn; he repeatedly interrupted *895 the judge to insert or reiterate his own comments. Toward the end of the discussion, Judge Huguelet remarked, "You keep on interrupting me. You don't even let me finish a sentence. I think that you have a serious[ ] mental [or] emotional problem, Mr. Israel. As I listen to you, you do not have the ability to keep your mouth shut while I try to tell you something."
Because Israel's behavior led Judge Huguelet to question whether Israel was capable of representing himself, the judge denied Israel's request to remove Browning from the case, but he told Israel that he could renew his request after he had a psychiatric evaluation.
Three weeks later, in mid-August 2005, Judge Huguelet again considered the issue of Israel's representation. Israel again indicated his dissatisfaction with Browning, and he again indicated his desire to represent himself. Browning said that she believed that Israel's mental state had deteriorated. Judge Huguelet again stated that he would take no action on this matter until Israel had undergone a psychiatric examination to determine his competency.
During the discussion of this and other pre-trial matters, Israel became frustrated when Judge Huguelet and Browning did not accede to his wishes. When Judge Huguelet tried to move on to other issues, Israel interjected an obscenity and declared that he simply wanted to plead guilty and be done with it:

Mr. Israel: Big fucking deal. . . . I'll just plead [guilty] right now, Your Honor. Is that all right with you? I'll just plead right now, [and] you can sentence me right now. You can do whatever you want [to me].

The Court: That's not the way it works.

Mr. Israel: Well, . . . I refuse to have [any] part of this. . . . This is corruption, and I refuse to be a part of it. . . . I've [described] several issues that should be more than enough, and there's nothing I can do about it, . . . so I refuse to be a part of it anymore. I'm not going to kiss anybody's assexcuse meto try and get a lesser [penalty;] you can give me 99 years right now. You want to? Then go ahead and do it. . . . I'm not going to let people lie and [just] stand by and watch that happen [and] forget it, you know? I'm not going to do that. You can do whatever you want, but I am not going to be a part of this anymore. Simple as that.
Judge Huguelet attempted to move on to other issues, but Israel continued to interrupt and argue. Israel's behavior eventually prompted Judge Huguelet to demand that Israel "be quiet". Israel responded, "This is a joke, . . . and I can't respect this at all."
Two weeks later, Judge Huguelet held another representation hearing in Israel's case. At that hearing, Browning indicated that Israel had still not had a mental examination. Apparently, an examination had been scheduled, but Israel had not cooperated with the examiner. Browning told the court that she believed Israel might be suffering a "delusional deterioration" because "all he wants to talk about is how I'm persecuting him." Judge Huguelet ordered a competency examination for Israel, to see if Israel suffered from a mental disease or defect that would prevent him from assisting in his own defense.
In mid-October, Judge Huguelet held yet another hearing regarding Israel's representation. By that time, Israel had undergone a competency examination. Based on the results of that examination, Judge Huguelet concluded that Israel was not competent to represent himself:

The Court: At this time, the defendant is not competent to represent himself by virtue of the fact of he is immature and prone to becoming emotionally overwhelmed, and has a tendency to be very impulsive when he is challenged or otherwise frustrated.
At this hearing, Israel repeatedly interrupted the judge and the attorneys. Because of this behavior, Judge Huguelet told Israel, "If I want to hear from you, I'll ask you to speak." Soon after this admonition, Israel interrupted again and attempted to inject his own issues into the discussion. Judge Huguelet responded:

The Court: Mr. Israel, we're doing a trial call. Be quiet.

*896 Mr. Israel: Well, I just . . .

The Court: Mr. Israel, . . .

Mr. Israel: . . . you know, is there time. . .

The Court: We can do [this] with you [here in the courtroom], or we can do it with you back in a holding cell. Now be quiet.
About ten weeks later, at a trial call on January 3, 2006, Israel again told Judge Huguelet that he wanted to waive his right to counsel and represent himself at trial. But toward the end of this hearing, Israel declared that he was not willing to waive his right to counsel.
A renewed trial call was held on January 6th. At this hearing, Israel became embroiled in another verbal battle with Judge Huguelet. He argued with the judge, he interrupted the attorneys, and he refused to move on to other issues when the judge attempted to do so.
On February 17th, the parties were back in court, this time because Browning had submitted a motion to withdraw. Browning believed that, given the deterioration of her relationship with Israel, she could not represent him zealously. Another assistant public defender, John Richard, had met with Israel to try to resolve the problem. Based on his discussions with Israel, Richard told the court that Israel seemed to be fixated on his conflict with Browningfocusing on this conflict rather than on the murder charge lodged against him. According to Richard, "[Israel] seemed much more interested in somehow punishing [Browning] than in [getting] effective representation [in] his murder-in-the-first-degree [prosecution]."
After further discussion, Judge Huguelet allowed Browning to withdraw and appointed Richard to be Israel's attorney.
Israel's trial was set to begin on April 10, 2006, but Richard sought a further continuance of the trial so that Israel's competency could again by examined. Richard told the court that, most of the time, Israel appeared to be alert, insightful, and well-orientedbut "then suddenly, as if someone else is taking over the conversation, [Israel] proceeds along a [wholly] irrational train of thought."
Although one psychiatrist, Dr. John Sperbeck, had already concluded that Israel was competent to stand trial, Richard disagreed. He told Judge Huguelet that he thought Israel's behavior might lead to his being wrongly convicted of first-degree murder.
The next day, Richard renewed his request for a continuance of trial. This motion was supported by Dr. Susan LaGrande, who told the court that she had "significant concerns about [Israel's] mental health"and that, if she was given time to fully evaluate Israel, she might disagree with Dr. Sperbeck's conclusion that Israel was competent to stand trial. Judge Huguelet ordered that Israel be examined again.
Following her examination of Israel, LaGrande submitted a report that was ambiguous on the question of Israel's competency to stand trial. In her report, LaGrande stated that "the results of [her] examination [were] in concert with Dr. Sperbeck's opinion that Mr. Israel [was] competent to stand trial". But this statement was immediately followed by qualifying language: LaGrande said that, in her opinion, Israel "suffer[red] from recurring episodes of major depression with paranoia and delusions", and that these episodes "[could], at times, affect Mr. Israel in making. . . rational and informed decision[s]." LaGrande added that Israel "report[ed] auditory hallucinations which [might] also, at times, affect his ability to accurately assess the reality of his situation."
Based on LaGrande's assessment, Judge Huguelet decided that a hearing was needed to assess Israel's competency.
At the ensuing competency hearing, LaGrande testified that Israel was potentially experiencing "schizophrenic-like [thought] processes" and that he was "significantly disconnected from reality." She explained that there was "a strong paranoid bent to his . . . thought processes", and that "at times . . . he appears to misunderstand the intentions of others in his case, including the judge and his counsel", to such an extent that it "affects his decision-making". Dr. LaGrande noted that Israel tended to respond to those around him with angry outbursts, because these outbursts gave him a sense of control or mastery. *897 In these outbursts, Israel "[was] not utilizing rational thought processes; [rather,] he [was] driven by the impulse of [his] anger".
Israel was also evaluated by Dr. Lawrence Maile of the Alaska Psychiatric Institute. Dr. Maile concurred with Dr. LaGrande that Israel would likely not behave himself in courtalthough Dr. Maile believed that Israel's disruptive behavior stemmed from his conscious choice, rather than mental illness:
Mr. Israel is aware of . . . the decorum required in a courtroom situation. [But he] does not state that he will behave in court[;] rather that he will speak his mind[,] whether given the guidance to do so or not by his attorney.
On August 16, 2006, Israel told the court that he was dissatisfied with the representation he was receiving from Mr. Richard. Judge Huguelet scheduled a representation hearing the following month. At this hearing, Israel stated that Richard was not communicating adequately with him, and was not acting in Israel's best interests. Richard, for his part, told the judge that Israel no longer trusted him. Even after Judge Huguelet announced that he would allow Richard to withdraw and would find another attorney for Israel, Israel insisted on detailing all of Richard's purported faults. He would not stop even though Judge Huguelet tried to explain that Israel had already gotten what he wanted.
A third attorney, Marvin Hamilton, was appointed to represent Israel. The court set the trial for November 6, 2006, but on October 30th Hamilton informed the court that he would not be available until November 14th. When Judge Huguelet asked Israel if he objected, Israel declared that he wished to waive his right to counsel and to represent himself. Israel told the judge that he did not feel that he could trust any of the attorneys who had been appointed to represent him, and he "just [didn't] care anymore".
Judge Huguelet denied Israel's request to represent himself. The judge noted that, even though Dr. Sperbeck had concluded that Israel was competent to stand trial, Dr. Sperbeck had also concluded that Israel was not competent to represent himself. Repeating Dr. Sperbeck's conclusions, Judge Huguelet stated that Israel "was immature and prone to becoming emotionally overwhelmed", and that he had "a tendency to be impulsive when challenged or otherwise frustrated." Judge Huguelet also noted that Dr. LaGrande had concluded that Israel suffered from "depression and anxiety, paranoia, and. . . bizarre thought processes". Then Judge Huguelet summarized his own experience with Israel during the various court proceedings:

The Court: I've had a lot of experience with Mr. Israel. I think his writing . . . is much more coherent than it was when we first started out, but I still don't think that he could represent himself in [a] trial. . . . I don't think Mr. Israel could represent himself because I think he is too emotionally involved in the case[.] [He] does have a tendency to be impulsive[.][A]nd [he] has occasionally fallen into a "whatever happens, happens" . . . mode [of thinking]; [he] just wants to sit there and have whatever happen. And I am not convinced that, under pressure, . . . he would be able to control himself in court or in front of the jury.
As we explained at the beginning of this section, a trial judge has the authority to reject a defendant's request for self-representation on either of two bases: if the defendant is not capable of presenting their case in a rational and coherent manner, or if the defendant is not capable of conducting their defense without being unusually disruptive.
Here, Judge Huguelet relied on the second ground: he concluded, based on the three psychiatric evaluations and on his own interactions with Israel during the pre-trial hearings, that Israel was not capable of controlling himself in the courtroom. The record that we have summarized in this section of our opinion adequately supports Judge Huguelet's conclusion.
In his brief to this Court, Israel contends that a recent decision of the United States *898 Supreme Court, Indiana v. Edwards,[4] has altered the legal test that governs a defendant's right of self-representation. In particular, Israel asserts that Edwards stands for the proposition that a defendant's inability to exercise self-control in the courtroom is no longer a proper ground for denying a defendant's request for self-representation unless that lack of self-control stems from a serious mental illness.
In Falcone v. State, 227 P.3d 469, 473 (Alaska App.2010), we rejected this interpretation of Edwards. We have considered the argument presented in Israel's brief, but we remain convinced that we reached the proper conclusion in Falcone.
For these reasons, we uphold Judge Huguelet's decision not to allow Israel to represent himself at trial.

The superior court's decision to allow the State to introduce evidence of an earlier altercation between Israel and his mother
Prior to Israel's trial, the State gave notice that it wished to introduce evidence of a number of past conflicts that Israel had with his family members. Judge Huguelet excluded some of this proposed evidence, but he allowed the State to introduce evidence of an altercation that occurred during the week before the homicide.
In this prior incident, Israel got into a fight with Chase Jenson. Jenson was a friend of Israel's brother, "A.J." Ravara. Ravara testified that this fight went on "for a bit" and that, following this fight, Ravara went to stay at Jenson's residence for several days because he did not feel comfortable in his own home.
At some point later that week, Ravara returned home to retrieve fresh clothing. While Ravara was in his room, Israel came into the room and confronted him: he criticized Ravara for not helping him during his fight with Jenson. This confrontation escalated when Israel started pushing Ravara, and then Israel punched him in the jaw. Another family member (a sister) yelled at Israel and told him to stop. Israel's mother, Dorothy, heard the commotion and came into the room. At this point, Israel stopped fighting with Ravara and walked out of the room. But as he was leaving, Israel turned and, pointing at his mother, he said, "You're all going to get itespecially you."
Judge Huguelet concluded that this evidence was not barred by Evidence Rule 404(b)(1) because it was relevant for a non-propensity purpose: specifically, the judge concluded that this earlier incident was relevant to prove Israel's intent when he later stabbed his mother.
We conclude that Judge Huguelet's ruling was reasonable. At Israel's trial, the State argued that Israel intentionally killed his mother, while Israel argued that the stabbing of his mother was accidental, and that he had not intended to harm her. The evidence of the earlier altercation, during which Israel threatened his mother, was directly relevant to the jury's resolution of this issue. We therefore uphold Judge Huguelet's ruling.

Whether Judge Huguelet should have disqualified himself
In November 2006, shortly before Israel's trial was scheduled to begin, Israel filed a pro se motion to disqualify Judge Huguelet.
Israel's motion was based on various rulings made by Judge Huguelet up to that point in the case: in particular, the judge's denial of Israel's motions to dismiss the charges based on allegations of prosecutorial misconduct, the judge's rulings regarding Israel's speedy trial deadline under Criminal Rule 45, and the judge's various rulings regarding Israel's requests to dismiss his attorneys, his attorneys' requests to withdraw, and Israel's requests to represent himself. Israel argued that, given these various rulings, reasonable people would necessarily question Judge Huguelet's impartiality.
Judge Huguelet accepted this pleading despite the fact that Israel was represented by counsel, and he later issued a written order denying the requested disqualification. Pursuant to AS 22.20.020(c), another judge was assigned to review Judge Huguelet's decision. *899 One week later, this judge affirmed Judge Huguelet's denial of Israel's motion for disqualification.
In Israel's pro se brief, he again argues that Judge Huguelet was obliged to disqualify himself because his rulings, viewed as a whole, would make reasonable people question the judge's impartiality. See Alaska Code of Judicial Conduct, Canon 3E(1); Amidon v. State, 604 P.2d 575, 578 (Alaska 1979).
We do not believe that Judge Huguelet's rulings bespeak partiality, either for the State or against Israel. As our supreme court has stated, the fact that a judge has repeatedly rejected a party's suggested interpretations of the law is not sufficient, standing alone, to demonstrate that the judge is biased.[5] Moreover, the remedy of judicial disqualification "was never intended to enable a discontented litigant to oust a judge because of adverse rulings [the judge has] made."[6]
It is true, as Israel points out, that Judge Huguelet at various times manifested frustration and impatience with Israel's courtroom behavior and advocacy. But as our supreme court has explained, "every judge, when [hearing] a case or [writing a decision,] must form an opinion on the merits [of the case] and ofttimes[,] no doubt[,] an opinion relative to the parties involved. But this does not mean that the judge has a [disqualifying] personal bias or prejudice." Wasserman v. Bartholomew, 38 P.3d 1162, 1171 (Alaska 2002).[7]
With regard to the various rulings that Israel complains about, all of them appear to be grounded in the facts of the case and the applicable law. These rulings were reasonable resolutions of the issues raised, and they do not demonstrate improper antagonism or bias against Israel. Accordingly, we uphold Judge Huguelet's refusal to disqualify himself.

Whether Israel's sentence is excessive
Israel was indicted and brought to trial on a charge of first-degree murder. The jury acquitted Israel of this charge, and instead found him guilty of the lesser offense of second-degree murder.
The offense of second-degree murder is an unclassified felony carrying a penalty of 10 to 99 years' imprisonment.[8] This Court has established a benchmark sentencing range of 20 to 30 years to serve for first felony offenders convicted of second-degree murder.[9]
Judge Huguelet sentenced Israel to a term of imprisonment outside this benchmark range: 40 years to serve (60 years with 20 years suspended). On appeal, Israel argues that the judge's reasons for exceeding the benchmark range are either improper or are not supported by the record.
As this Court explained in Carlson v. State, 128 P.3d 197, 203 (Alaska App.2006), the legal effect of the benchmark range for second-degree murder is that "sentencing judges who wish to impose more than 30 years to serve for [this] crime . . . must explain why they view the defendant as having a worse background than that of a typical first felony offender, or why they view the defendant's crime as worse than a typical second-degree murder."
In Israel's case, Judge Huguelet's decision to exceed the benchmark sentencing range is at least presumptively explained by the fact that the State proved two of the aggravating factors codified in AS 12.55.155(c).
The aggravating and mitigating factors codified in AS 12.55.155(c)-(d) do not apply to second-degree murderor to any other offense that is subject to indeterminate sentencing *900 under AS 12.55.125(a) or (b).[10] Nevertheless, Israel's jury was asked to return verdicts on two aggravating factors: (c)(18)(A)that Israel's offense was committed upon a person living is the same dwelling; and (c)(18)(C)that Israel's offense was a crime involving domestic violence and was committed in the physical presence or hearing of a child under 16 years of age (to wit, Israel's eight-year-old brother, Corbin Schoeffel). The jury found that both of these aggravators were proved beyond a reasonable doubt.
The legislative policy behind all of the aggravating factors listed in AS 12.55.155(c) is "to identify those factors that might distinguish a particular defendant's background or conduct from those of a typical first, second, or third felony offender [convicted of the same offense]". Malutin v. State, 198 P.3d 1177, 1185 (Alaska App.2009). Thus, it would appear that the proof of the two aggravators in Israel's case provided a potential legal basis for classifying Israel's offense as atypically seriousthus potentially justifying an upward departure from the 20- to 30-year benchmark sentencing range.
On appeal, Israel argues that the first aggravatori.e., the fact that Israel and his mother were living in the same dwelling does not justify an upward departure from the benchmark sentencing range. Israel relies on several studies suggesting that a substantial portion of homicides in this country (upwards of 20 percent) are committed against family members.
But even if we assume that a significant portion of homicides are committed against family members, this does not mean that the legislature acted unreasonably when it designated the killing of a person living in the same social unit as an atypically serious homicide.
In Pickard v. State, 965 P.2d 755 (Alaska App.1998), this Court upheld a fairly severe sentence4 years to servefor a first felony offender convicted of third-degree assault (a class C felony) arising from an act of domestic violence. In explaining our decision to affirm this sentence, we stated that the sentencing judge "could properly emphasize the need to re-affirm societal values". Id. at 761. We noted that both the Alaska Legislature and this Court have recognized that domestic violence represents a serious danger to its victims, as well as a significant harm to society at large. Ibid.
Israel also argues that Judge Huguelet should not have relied on the second aggravatori.e., the fact that the homicide was committed in the physical presence or hearing of Israel's eight-year-old brother, Corbinbecause Judge Huguelet found that the facts of the case did not support this aggravator.
Israel relies on a portion of Judge Huguelet's sentencing remarks, where the judge said:

The Court: On the aggravating side, [Israel's] offense was committed in close proximity to a young child, a brother. . . . He may not have seen anything, or he may not have heard anything. But shortly after this murder, this child knew what happened, and his imagination would have filled in all the blanks. And [his imagination] is probably still continuing to fill in all the blanks, and will do so for the rest of his life.
Israel argues that, in this portion of his sentencing remarks, Judge Huguelet "conceded that the evidence [supporting this aggravator] was lacking". We do not agree with this characterization of the judge's remarks.
As we explained above, this aggravator was submitted to the jury for decision, and the jury found the aggravator proved beyond a reasonable doubt.
(The parties apparently agreed to this procedure, even though Israel was not entitled to a jury trial on this aggravator under Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), since the presence or absence of aggravating factors does not affect the superior court's sentencing authority on a charge of murder in either the first or second degree.)
*901 Given the fact that the jury decided this issue, Judge Huguelet would presumably honor the jury's decision unless he found that it was unsupported by the evidencei.e., unless he expressly found that no reasonable person could have found that the murder occurred within the hearing of Israel's younger brother. Judge Huguelet never declared that he was making such a finding.
Moreover, we have examined the record of Israel's trial, and the evidence is legally sufficient to support the jury's verdict. At trial, Corbin testified that he was sitting in the family's truck, in the driveway of the residence, at the time of the murder. He said that he watched and listened as Israel and his mother argued at the front door. When Israel and his mother stepped inside the house, Corbin remained in the truck. At trial, Corbin denied that he had observed or heard the murder. However, the State introduced evidence that when Corbin was interviewed by the police shortly after the homicide, he said that he heard his mother yell when she was stabbed.
This evidence, if believed, was sufficient to allow reasonable jurors to find that the State had proved the aggravator. Thus, even if we construe Judge Huguelet's sentencing remarks as indicating that he had personal doubts about the strength of the State's evidence on this point, the fact remains that the jury found the aggravator to be proved, and the evidence was sufficient (as a legal matter) to support the jury's verdict.
Israel next argues that Judge Huguelet misconstrued the evidence and, as a result, erroneously concluded that Israel's offense was aggravated because Israel failed to show genuine remorse for killing his mother. Here is what Judge Huguelet said about this issue:

The Court: On the mitigation side, [it has] been suggested [by Israel's attorney] that there was remorse. And there were a couple of moments during the trialparticularly, at the beginning of the trial when [the prosecutor] brought out a picture of Dorothy Israel, and showed it to the prospective jurorsthere was a moment [when] there appeared to be some genuine remorse on the part of Mr. Israel. You know, [he had] a physical reaction to seeing the picture [of his mother]. [But] then again, there were other parts of the trial, and the time before the trial, where he seemed angry and shockingly self-centered [and] defiantwhich would suggest that [his] remorse was more for what Mr. Israel did to himself, rather than what he did to Dorothy Israel.
...
This is a case [where the sentence should exceed the] benchmark because of the domestic violence, because of the proximity of the child, [and] because of the lack of genuine remorse displayed [by the defendant].
Israel argues that Judge Huguelet's view of the evidence on this issue (i.e., the presence or absence of genuine remorse) is clearly mistaken. Israel points out that, according to the officers who arrived on the scene to investigate the stabbing, Israel was visibly upset, and he repeatedly urged the emergency responders to quickly do everything possible to save his mother. Then, when Israel was told that his mother had died, he began to wail, and he suggested that he should receive the death penalty. Israel also notes that, several times during the pre-trial proceedings, he told the court that he wanted to simply plead guilty.
However, the question of whether Israel displayed genuine remorse is a question of fact. When we review Judge Huguelet's finding on this issue, we are obliged to view the record in the light most favorable to the judge's finding, and then decide whether his finding is clearly erroneous.[11]
It is true that Israel called 911 immediately after stabbing his mother, and that he appeared to be extremely concerned for his mother's survival. These facts would obviously support a finding that Israel was genuinely remorseful (if Judge Huguelet had made such a finding), but these facts do not mean that any contrary conclusion is clearly erroneous.
*902 In reaching his conclusion that Israel's remorse was prompted more by the adverse consequences that Israel would suffer, as opposed to the harm done to the victim, Judge Huguelet relied on Israel's in-court behavior. As we have previously explained, Israel was often obstinate and difficult to deal with during these court proceedings. At times, when Israel felt that the case was not proceeding in the manner he wished, he would become frustrated and would demand to plead guilty, or demand to be sentenced to life in prison. Given this context, Judge Huguelet could reasonably conclude that Israel's statements and demands were not the product of genuine remorse.
We note, in addition, that one of the psychological reports presented to Judge Huguelet indicated that Israel tended to blame others when things did not go his way, rather than accept responsibility for his actions. Statements given by several family members supported this finding: they often described Israel as someone who would blame others for what happened to him, and who would not take responsibility for his actions.
For these reasons, reasonable people could differ on the question of whether Israel's seeming expressions of remorse were genuine. And this being so, we can not say that Judge Huguelet's finding on this issue is clearly erroneous.
Israel also argues that Judge Huguelet was clearly mistaken when he emphasized the sentencing goal of specific deterrence (i.e., deterrence of Israel personally) and the sentencing goal of isolating Israel to prevent further criminal conduct. Israel contends that his assault on his mother was an atypical act that arose from an isolated, stressful situation. But Israel had engaged in other acts of violence, as illustrated by the evidence of the altercations with his brother, "A.J." Ravara, and his brother's friend, Chase Jenson, that we discussed earlier in this opinion. Moreover, several members of Israel's family submitted statements for inclusion in the pre-sentence report, in which they described Israel as often violent, to the point where they were afraid of him, and afraid of what he might do when he was released from prison.
Israel also argues that Judge Huguelet failed to give proper weight to the sentencing goal of rehabilitation. But as we explained in Pickard, 965 P.2d at 760, "a sentencing judge bears primary responsibility for determining the priority and relationship of the various sentencing goals in each case."[12] Having examined the record, we can not say that Judge Huguelet's weighing of the various sentencing goals was clearly mistaken.
For all of these reasons, we uphold Judge Huguelet's sentencing decision.

Conclusion
The judgement of the superior court is AFFIRMED.
NOTES
[1] Faretta v. California, 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562 (1975) (recognizing a criminal defendant's right to self-representation under the Sixth and Fourteenth Amendments); McCracken v. State, 518 P.2d 85, 91 (Alaska 1974) (holding that a criminal defendant's right to self-representation is guaranteed by Article I, Section 21 of the Alaska Constitution); McIntire v. State, 42 P.3d 558, 560 (Alaska App.2002).
[2] McCracken v. State, 518 P.2d 85, 91 (Alaska 1974).
[3] Lampley v. State, 33 P.3d 184, 189 (Alaska App.2001).
[4] 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008).
[5] DeNardo v. Corneloup, 163 P.3d 956, 967 (Alaska 2007); Jourdan v. Nationsbanc Mortgage Corp., 42 P.3d 1072, 1082 (Alaska 2002).
[6] DeNardo, 163 P.3d at 967.
[7] Citing State v. Anchorage, 513 P.2d 1104, 1112 (Alaska 1973).
[8] AS 11.41.110(b) (classifying second-degree murder as an unclassified felony) and AS 12.55.125(b) (providing a penalty range of 10 to 99 years' imprisonment).
[9] Page v. State, 657 P.2d 850, 855 (Alaska App. 1983).
[10] See Lindeman v. State, 244 P.3d 1151, 1162 (Alaska App.2011); Hinson v. State, 199 P.3d 1166, 1172 (Alaska App.2008). In general, see AS 12.55.155(a).
[11] Lepley v. State, 807 P.2d 1095, 1099 n. 1 (Alaska App. 1991).
[12] Citing Asitonia v. State, 508 P.2d 1023, 1026 (Alaska 1973).