Thomas L. BELTZ, Appellant,

v.

STATE of Alaska, Appellee.

Nos. A–4812, A–5092.

Court of Appeals of Alaska.

May 12, 1995.

Rehearing Granted July 5, 1995.

A. Lee Petersen, Anchorage, for appellant.

James L. Hanley, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Thomas L. Beltz appeals his convictions for first-degree sexual abuse of a minor, AS 11.41.434(a), as well as the superior court's denial of his ensuing petition for post-conviction relief. We reverse Beltz's conviction because we conclude that the trial court improperly prohibited Beltz from introducing evidence to impeach his wife.

In January 1991, Beltz and his wife were living apart. Beltz's three children were living with him. According to the evidence in the light most favorable to the State, Beltz awakened his 11–year–old daughter, T.B.; he told her that she felt hot and that she should take some medicine. Beltz escorted T.B. downstairs, where Beltz gave his daughter both Tylenol and a cough medicine similar to Nyquil. When T.B. began to fall asleep on the couch, Beltz took her to sleep in his bed. T.B. came awake when Beltz began to pull down her panties; however, she pretended to be asleep. Beltz then proceeded to perform sexual penetration upon his daughter.

T.B. did not report this incident to her mother until almost a year later. When she heard her daughter's account, T.B.'s mother confronted Beltz. Beltz denied any misconduct, but he made an appointment for his family to receive counseling at Charter North Hospital. The hospital staff informed Beltz that no counseling could begin until he apprised authorities of his daughter's report of sexual abuse. So Beltz and his wife drove to the Palmer office of the Alaska State Troopers, where he reported that his daughter had accused him of sexual abuse.

Alaska State Trooper Investigator Jamie Hall was informed by a clerk that there was a gentleman at the front counter who wished to "talk to somebody about sex abuse". Investigator Hall met Beltz and interviewed him for forty minutes. During the interview, Beltz at first asserted that his daughter's account was false, but he eventually did an about-face and admitted the sexual abuse. Beltz told Hall, "Everything my daughter says is true."

Beltz was indicted on two counts of first-degree sexual abuse of a minor (Count I alleging cunnilingus and Count II alleging fellatio). Following a jury trial, Beltz was convicted of both counts.

Beltz first argues that the superior court improperly prevented him from cross-examining his daughter regarding the fact that she had complained to school authorities about a male teacher who had put his arm around her. In the trial court, Beltz asserted that his daughter had lodged the complaint to retaliate against the teacher for his attempts to discipline her. Beltz argued that the complaint was relevant to his trial because it was "quasi-sexual" in nature, because it occurred "near in time" to his alleged offenses, and because it suggested that

his daughter had engaged in a series of false accusations. Superior Court Judge Beverly Cutler ruled that Beltz could not cross-examine his daughter concerning this incident.

On appeal, Beltz asserts that he should have been permitted to engage in this cross-examination. However, before Beltz would be entitled to impeach his daughter with her complaint against the teacher, it was essential for Beltz to establish that his daughter's complaint against the teacher was unfounded. *Covington v. State*, 703 P.2d 436, 442 (Alaska App.1985); *Daniels v. State*, 767 P.2d 1163, 1167 n. 3 (Alaska App.1989). Beltz presented no evidence that T.B.'s complaint was fabricated. In fact, Beltz's attorney candidly admitted to Judge Cutler, "We don't have any [reason] to think that ... anything she's saying [is] false". For this reason, Judge Cutler correctly prohibited Beltz from impeaching his daughter with her complaint against the teacher.

Beltz next argues that he should have been permitted to introduce evidence that T.B. had been involved in a burglary that was informally adjusted by the Division of Family and Youth Services. Beltz contended that this incident illustrated Beltz's role as the family disciplinarian and that, because Beltz attempted to discipline his daughter for the burglary, T.B. was motivated to fabricate allegations of sexual abuse against him.

Judge Cutler agreed that the episode did have probative value to the extent that it tended to show that T.B. might have had a motive to retaliate against her father's discipline by accusing him of sexual abuse. The judge ruled that Beltz was entitled to present evidence that there was an incident for which Beltz disciplined T.B.. However, Judge Cutler instructed Beltz and his attorney to characterize the incident as "trouble", referring to it generally rather than going into the specifics of what the trouble was (burglary). She entered a protective order against Beltz's use of the words "burglary" or "juvenile delinquent" or "juvenile prosecution" when eliciting information about the burglary from T.B. in front of the jury. However, Judge Cutler left the door open for more detailed evidence about the burglary if, during the course of the trial, it became apparent that the specifics of the incident would be more probative than prejudicial.

During the ensuing cross-examination of T.B., Beltz asked T.B. (1) whether she had had some problems in the neighborhood, (2) whether it had taken a long time to resolve these problems, (3) whether it was her father who usually punished her (spanked and grounded her), and (4) whether her father became so upset after hearing, at a parent-teacher conference, that T.B. was doing poorly in school that he beat her with a belt. T.B. gave affirmative answers to all of these questions. When asked whether she felt that Beltz had picked on her, T.B. said no, but that she had received special punishment (the beating with a belt) as a result of her poor grades.

It appears that the jury also heard about the burglary when the audio tape was played of the interview between Beltz and Investigator Hall. On the tape, Beltz told Hall that, when his wife returned to live with the family,

> It was pretty rough, [pretty] rocky.... My daughter was charged with burglary [and,] shortly thereafter, we were dealing with Youth [and] Family Services. [T.B.] had [had] a 3.5 grade average from sixth grade, [but] when my wife returned we started having all kinds of problems with [T.B.]. [Her] grades went down, [and] coupled with the burglary and everything else, ... I just wondered. And [we] went through Youth Services on that, and had that resolved.

This audio tape was played twice, once during the State's case-in-chief and once during Beltz's case.

In addition, when Beltz took the stand at his trial he began to describe the burglary incident. He stated, "In July of that year, [T.B.] was overnighting next door ... at this little girl's house. There was [sic] some girls come up from Anchorage ..." Beltz was interrupted by a bench conference about Beltz's anticipated testimony. When direct examination resumed, Beltz's attorney asked him whether the incident he had been describing was the same one that he described

to Investigator Hall during his interview. Beltz said yes.

■ On appeal, Beltz again asserts that he should have been allowed to refer to the incident as a "burglary" and to inform the jury that the juvenile authorities had been involved. However, his argument rests on generalized assertions of the right of cross-examination. Beltz does not discuss the details of the trial court's ruling, nor does he specifically argue how that ruling failed to afford him the opportunity to apprise the jury of the substance of the incident and its potential biasing influence on T.B.. We find no error. Moreover, the record indicates that, despite the trial judge's ruling, Beltz was able to present all his desired evidence. Thus, we alternatively find no prejudice.

Beltz next challenges the superior court's decision to allow the State to present evidence of another sexual incident involving Beltz and T.B.. Sometime after Beltz sexually abused T.B., but before T.B. revealed the abuse, T.B. was in bed sleeping with her parents when she felt something poking her in the back. Thinking that it was her brother, T.B. turned around to find that it was her father; Beltz was poking her with his penis and laughing about it. T.B. told her mother about the incident, but her mother dismissed it; she told T.B. that Beltz did that same thing to her and that he must have mistaken T.B. for her.

Beltz asked the superior court for a protective order precluding the State from introducing evidence of this second incident. Beltz argued that this incident should be excluded because it was "remote in time" (it occurred "at least three months" after the incident charged in the indictment) and because it did not "seem to advance the case one way or another for the State". In response, the State argued that this incident was relevant to explain why T.B. had waited so long to reveal the more serious acts of abuse to her mother (because she revealed the less serious incident and her mother did not support her).

After hearing these arguments, Judge Cutler ordered the State not to mention this second incident in its opening statement and also ordered the State to seek a hearing outside the presence of the jury before introducing any evidence regarding the incident.

The issue resurfaced when T.B. began to explain why she had waited nearly a year to tell her mother about the sexual abuse charged in the indictment. Outside the presence of the jury, T.B. testified that she was reluctant to tell her mother about the more serious abuse because, when she told her mother about the less serious incident, her mother simply excused her father's conduct. After hearing T.B.'s proposed testimony, Beltz's attorney stated that he no longer had any objection to the testimony. The jury was recalled, and T.B. reiterated her answers in open court.

■ On appeal, Beltz argues that this testimony should not have been admitted. However, the record plainly reveals that Beltz affirmatively withdrew his objection to this testimony after he heard the State's offer of proof. If it was error to admit T.B.'s testimony about the other incident, it was clearly invited error. *See Barrett v. State,* 772 P.2d 559, 568–69 n. 10 (Alaska App.1989).

■ Moreover, we find no error. The evidence was plainly relevant to explain T.B.'s year-long delay in revealing Beltz's sexual abuse. Judge Cutler did not abuse her discretion when she ruled that this evidence could be heard by the jury.

Finally, Beltz argues that the trial judge improperly prevented him from impeaching his wife with evidence that she had beat him with her fists during one argument and had pointed a gun at him during another argument in 1986.

Judy Beltz took the stand as a government witness at her husband's trial. During cross-examination by Beltz's attorney, Ms. Beltz testified that the couple had had serious fights during the entire 16–year course of the marriage. When asked about the six years they lived in Kenai (from 1984 to 1990), Ms. Beltz admitted that she had slapped her husband and had falsely accused him of being a homosexual.

The couple moved to Anchorage in 1990, but then Mr. Beltz took the children to Wasilla without Ms. Beltz's permission. Ms.

Beltz came to live with her husband and the children in Wasilla, but she moved out twice when her husband ordered her to leave. Ms. Beltz also conceded that, when Beltz ordered her to move out the second time, she believed that he was considering divorcing her, that there would be a custody fight over the children, and that her husband would probably win. Ms. Beltz testified that she was worried about her husband's obtaining custody of the children, and she also told the jury that when she moved back to Wasilla in June 1991 to resume living with her husband, it was not out of love for him but rather her desire to be with her children.

During this cross-examination, Beltz's attorney sought to elicit more details of physical violence that Judy Beltz had inflicted on her husband. In voir dire outside the presence of the jury, Judy Beltz testified that she and Beltz had had several arguments during the six years they lived in Kenai, and that on one occasion she beat her husband with her fists and tore his clothing. During another argument, after Beltz had threatened to take custody of their children, Judy Beltz pointed a gun at him. This gun-pointing incident occurred in 1986.

Beltz's attorney argued that the evidence of these violent confrontations showed the intensity of the disputes between the Beltzes and, in particular, showed the intensity of Judy Beltz's response when Beltz threatened to take the children from her. The defense attorney asserted that this evidence tended to support his theory of the case—that Judy Beltz had influenced her daughter to concoct a false report of sexual abuse so that she could obtain custody of the children.

Judge Cutler ruled, however, that this evidence would not be admitted. Noting that the jury had already heard evidence about the Beltzes' bad marital relationship, the judge concluded that additional evidence that Judy Beltz had assaulted her husband six years before would not materially help the jury decide the case and would instead distract them with collateral issues.

■ Generally speaking, trial judges should freely allow counsel to demonstrate the grounds for a witness's potential bias. *R.L.R. v. State*, 487 P.2d 27, 44 (Alaska 1971).

However, the question of what specific questions will be allowed and what specific evidence will be admitted is entrusted to the trial judge's discretion, and we will not reverse the trial judge's ruling absent a showing that this discretion has been abused. "An abuse of discretion occurs only when the jury did not otherwise receive information adequate to allow it to evaluate the bias and motives of a witness." *Stumpf v. State*, 749 P.2d 880, 901 (Alaska App.1988).

In Beltz's case, the jury heard that the Beltzes' marriage had been rocky for sixteen years. The jury heard that, in 1990, Beltz took the children to live in Wasilla, leaving his wife behind in Anchorage, and that when Ms. Beltz moved to Wasilla to rejoin her family, Beltz twice ordered her to leave. The jury also heard that Judy Beltz feared that her husband was contemplating a divorce and that he would successfully fight her for custody of the children. Additionally, the jury heard that Ms. Beltz, when she finally moved back in with her husband, made this choice only to be with her children and not because she loved her husband.

■ However, we conclude that the additional evidence offered by the defense—in particular, the evidence of Ms. Beltz's armed assault on her husband—was materially different from the evidence recited in the previous paragraph. We agree with the defense attorney that the offered evidence showed the intensity of Ms. Beltz's feelings toward her husband, and her feelings about the child custody issue, in a manner not replicated by the other evidence.

Judge Cutler was, of course, entitled to weigh the probative value of the evidence against its potential for "unfair prejudice, confusion of the issues, or misleading the jury", and to exclude the evidence if these prejudicial aspects outweighed the evidence's probative value. *See* Alaska Evidence Rule 403. However, under the particular facts of Beltz's case, the offered evidence had few or no prejudicial aspects. Ms. Beltz readily admitted committing the two assaults on her husband. Moreover, unlike most cases in which a witness is alleged to have committed an assault, Ms. Beltz never asserted that she

acted in self-defense or in response to serious provocation from her husband. Under these facts, the possibility that Beltz's trial would be side-tracked by a "mini-trial" (extensive litigation concerning the details or the reasons underlying the assaults) was uniquely small.

Judge Cutler pointed out that the incidents of violence had occurred six years before. However, given the ongoing nature of the Beltzes' dispute over custody of their children, this passage of time does not significantly weaken the probative force of the evidence. Rather, it supports the inference argued by the defense attorney: that Ms. Beltz had abandoned violence toward her husband in favor of a more sophisticated scheme to obtain custody of the children (manufacturing allegations of sexual abuse).

Finally, there was little or no possibility that the jury would misuse the evidence. Even if the jury concluded, after hearing evidence of the two assaults on Thomas Beltz, that Ms. Beltz was a violent and unlikable person, there was little or no possibility that the jury would be tempted to use this proffered evidence of Ms. Beltz's bad character as a basis for acquitting Beltz of sexually abusing his daughter.

Given the probative value of the evidence and its uncommonly low potential for prejudicing the proceedings, we conclude that Judge Cutler abused her discretion when she refused to allow Beltz to cross-examine his wife about the domestic violence connected with the Beltzes' custody dispute. And, again based on our conclusion that this evidence was uniquely probative of Ms. Beltz's motives, we conclude that the trial judge's ruling was not harmless error. *Love v. State,* 457 P.2d 622, 629–631 (Alaska 1969). Beltz is entitled to a new trial.

Although we are reversing Beltz's convictions, we must nevertheless address Beltz's appeal of the superior court's denial of his petition for post-conviction relief. In this petition, Beltz asserted a single ground for relief: that his confession to Trooper Hall was involuntary.

■ Under Alaska Criminal Rule 12(b)(3), a motion "to suppress evidence on the ground that it was illegally obtained" must be filed before trial. Under Criminal Rule 12(e), a defendant's failure to raise such a motion before trial "shall constitute waiver thereof". In the original trial court proceedings, Beltz did not challenge the admissibility of his statements to Trooper Hall. Because of this, Beltz is not entitled to raise a suppression argument in a petition for post-conviction relief. *Gudmundson v. State,* 822 P.2d 1328, 1332 (Alaska 1991); *Marrone v. State,* 653 P.2d 672, 674–75 (Alaska App. 1982). *See Fajeriak v. State,* 520 P.2d 795, 803 (Alaska 1974) (a defendant's failure to object at trial to the composition of his jury precluded his raising this issue in a petition for post-conviction relief).

■ Beltz's petition for post-conviction relief did not assert that his attorney acted incompetently by failing to attack the voluntariness of Beltz's statements to Hall. Beltz did, however, argue that the suppression issue should not be viewed as waived. Beltz asserted that it was his attorney's decision not to attack the voluntariness of Beltz's statements to Trooper Hall, and that his attorney failed to obtain Beltz's personal assent to this decision. Therefore, Beltz concluded, he never personally waived his right to seek suppression of his interview with Hall.

■ The answer to this argument is that Beltz's personal assent to his attorney's tactical decision was not required. The supreme court's decisions in *Gudmundson* and *Fajeriak*, like this court's decision in *Marrone*, do not rest on principles of personal waiver. Rather, these decisions enforce the principle of finality embodied in Criminal Rule 12: that the non-jurisdictional defenses listed in Rule 12(b) must be raised before trial or they are forfeited (absent a showing of good cause for the defendant's failure to raise them). Because Beltz failed to attack the admissibility of his statements during the trial proceedings, he would be precluded from attacking those statements on direct appeal. And as this court pointed out in *Marrone*, it would be illogical to allow Beltz to raise issues in a petition for post-conviction relief that he would be precluded from raising in a direct appeal. *Marrone*, 653 P.2d at 675.

Beltz might still be entitled to litigate his claim under the rubric of plain error. See the discussion in *Marrone*, 653 P.2d at 675. However, we find no plain error. The trial court record does not reveal that Beltz's statements to Hall were plainly involuntary. If anything, the trial court record indicates the opposite.

Beltz came voluntarily and unannounced to the State Trooper office. Having arrived, he asked the desk clerk to summon an officer so that he (Beltz) could report the fact that his daughter had accused him of sexual abuse. At trial, Beltz conceded that he knew he could have left the interview at any time he wished. Beltz was plainly not in custody. *See Long v. State*, 837 P.2d 737, 740–41 (Alaska App.1992) (the test for custody is an objective one: "would a reasonable person have felt free to break off the interrogation and, depending on the location, either leave or ask the police to leave?").

Beltz argues that there was a point during his interview with Trooper Hall when Hall began to regard Beltz as the subject of a criminal investigation. Beltz asserts that Hall violated the law when, at this point, he failed to advise Beltz of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and instead continued to interview Beltz with the aim of obtaining further incriminating information.

However, the fact that Hall may have come to suspect Beltz of sexually abusing his daughter during the interview did not trigger any obligation for Hall to advise Beltz of his rights. A suspect's right to receive *Miranda* warnings hinges on whether the suspect is in custody, not whether the interviewing officer has identified the suspect as the focus of investigative suspicion. Both the Alaska Supreme Court and the United States Supreme Court have explicitly rejected "focus of suspicion" as a test for whether a suspect is in custody. *Hunter v. State*, 590 P.2d 888, 892–93 (Alaska 1979); *Beckwith v. United States*, 425 U.S. 341, 346–47; 96 S.Ct. 1612, 1616–17; 48 L.Ed.2d 1, 5 (1976).

Beltz argues that his statements to Hall were involuntary because he was under significant stress in his personal life, stress that led him to feel that he might as well confess to any crime his daughter had alleged. However, to the extent that Beltz might have felt private pressures to confess, these pressures do not render his statement involuntary. A claim of involuntariness must rest on coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 167; 107 S.Ct. 515, 522; 93 L.Ed.2d 473 (1986); *Macauly v. State*, 734 P.2d 1020, 1023 (Alaska App.1987).

Moreover, Beltz was a former police officer and corrections officer. He was familiar with the *Miranda* rights, and he was aware that those rights applied to him during his interview with the trooper.

Beltz points to various times during the interview when Trooper Hall expressed sympathy with him. Beltz argues that Hall's remarks caused him to relax his guard and confess to sexually abusing his daughter when he otherwise would not have. However, an interviewing officer's expressions of sympathy do not render an ensuing confession involuntary. *Thompson v. State*, 768 P.2d 127, 131–32 (Alaska App.1989).[1]

The test for the voluntariness of a statement is whether, after examination of all the circumstances, the record "discloses that the conduct of law enforcement [officers] was such as to overbear [the defendant's] will to resist and bring about confessions not freely self determined". *Stobaugh v. State*, 614 P.2d 767, 771–72 (Alaska 1980) (quoting *United States v. Ferrara*, 377 F.2d 16, 17 (2nd Cir.1967)). To prove plain error, it is Beltz's burden to demonstrate that the trial court record plainly reveals that Hall engaged in conduct that overcame Beltz's will to resist. The trial court record does not show this.

In an affidavit that Beltz filed with his petition for post-conviction relief, Beltz asserts that he subjectively interpreted Hall's sympathetic statements as an implicit

---

1. Thompson pursued habeas corpus relief in federal court. His case is currently pending in the United States Supreme Court; *Thompson v. Keo-* *hane, cert. granted*, —— U.S. ——, 115 S.Ct. 933, 130 L.Ed.2d 879 (1995).

indication that Hall did not intend to initiate a criminal prosecution against him, even though such an interpretation of Hall's remarks might not have been objectively warranted. These assertions of Beltz's subjective state of mind are not part of the trial court record; Beltz can not rely upon them to establish plain error.

For these reasons, the superior court's judgement in the post-conviction relief action is AFFIRMED. However, the superior court's judgement in the criminal prosecution is REVERSED; Beltz is entitled to a new trial.