NOTICE

*The text of this opinion can be corrected before the opinion is published in the* Pacific Reporter. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

LISA MIRANDA TROUT,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-11365
Trial Court No. 3AN-09-10541 CR

O P I N I O N

No. 2504 — June 24, 2016

Appeal from the Superior Court, Third Judicial District, Anchorage, Michael Spaan, Judge.

Appearances: Kelly R. Taylor, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Eric A. Ringsmuth, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Suddock, Superior Court Judge.[*]

Judge ALLARD.

---

[*]   Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

A jury convicted Lisa Miranda Trout of two counts of first-degree sexual abuse of a minor and one count of second-degree sexual abuse of a minor based on allegations that she sexually abused her oldest son, J.T.

Trout challenges her convictions on appeal, raising four claims of error. She first argues that the superior court committed plain error when it failed to ensure that her decision to testify at trial was made knowingly, intelligently, and voluntarily. Second, she argues that the court should have instructed the jury to presume that a police detective's missing notes, had they been available, would have been favorable to her. Third, Trout argues that the court should have allowed the jury to hear more details about her ex-husband's prior domestic violence because it was relevant to prove that her ex-husband had manipulated their oldest son into making false allegations against her. Lastly, Trout argues that the trial court erred when it sentenced her to a term of active imprisonment beyond the presumptive range for her most serious offense without any finding of good cause.

For the reasons explained here, we reject Trout's claims and affirm her convictions and sentence.

*Background Facts*

Lisa Trout and her ex-husband Dunovan Trout have three boys. The couple married in 1993, separated in 2000, and divorced acrimoniously in 2002. There was domestic violence in the relationship. Trout had sole custody of the children from 2000 until 2009, and during that period, Dunovan saw the children only occasionally.

Trout was a heavy drinker. And, according to all three of her sons, she was violent and abusive when she was intoxicated. J.T., Trout's oldest son, testified that he tried to protect his brothers from Trout when she became intoxicated.

Trout was arrested in 2009 for felony driving under the influence. During her incarceration, Trout's children went to live with their grandfather (Trout's father) and his wife. J.T., who was fifteen years old at the time, located his father Dunovan on the internet. The boys began communicating and visiting with their father. After an argument with their grandfather, the boys moved in with Dunovan, his new wife Michelle, and their daughter.

At some point while J.T. and his brothers were living with Dunovan, J.T. became angry and upset. Dunovan asked J.T. about his relationship with his mother and whether she hurt him. J.T. said "yes," and his father continued asking questions, including whether she hit him and whether she raped him. J.T. began to cry and said "yes." Dunovan and J.T. told the pastor at their church that J.T.'s mother sexually abused him.

Around the same time, Dunovan's wife Michelle reported to the police that Dunovan had driven while intoxicated and physically assaulted her. In response to these allegations, Dunovan told the police that Michelle had physically abused the children and, for the first time, he reported to the police that J.T. had alleged that his mother sexually abused him.

Following this report, Michelle brought J.T. to a children's advocacy center, and J.T. told a social worker and Anchorage Police Detective Brett Sarber that his mother had been sexually abusing him since he was in kindergarten or first grade.

Detective Sarber began an investigation and obtained a *Glass* warrant to record a conversation between J.T. and his mother.[1] To prepare J.T., Sarber wrote a list of questions on a notepad for J.T. to ask his mother. During the phone call, J.T. told Trout it had been bothering him for some time that she had sex with him. Trout denied having any memory of abusing J.T. and blamed any possible wrongful behavior on her

---

[1]   *See State v. Glass*, 583 P.2d 872, 879-81 (Alaska 1978).

excessive use of alcohol. When J.T. asked Trout if she ever sexually abused his brothers or if it was just him, Trout responded that it was "just [him]."

Sarber also separately interviewed Trout. During this interview, Trout denied the allegations. At one point in the interview, however, she stated that she wondered if something might have happened between her and J.T. when she woke up after a night of drinking.

Trout was charged with one count of first-degree sexual abuse of a minor for engaging in fellatio with J.T. and one count of first-degree sexual abuse of a minor for having sexual intercourse with him;[2] both incidents were alleged to have taken place in February or March of 2009 (*i.e.*, shortly before Trout's 2009 arrest for felony DUI). Trout was also charged with a third count, second-degree sexual abuse of a minor for touching J.T.'s genitals in October 2008.[3]

*Trout's Trial*

The State's theory at trial was that J.T. protected his brothers from physical abuse and neglect in their home while Trout sexually abused J.T. for many years. The State submitted evidence of both parents' alcohol abuse problems, prior Office of Children's Services (OCS) involvement with the family, and Trout's physically abusive conduct toward her children when she was intoxicated. All three boys testified that their mother physically abused them when she was intoxicated. Dunovan also testified about his sons' reports of physical abuse, stating that, according to his sons, Trout beat them with wine bottles and curtain rods, and that they had sometimes slept in the car in winter to escape Trout's abuse.

---

[2]  AS 11.41.434(a)(2).

[3]  AS 11.41.436(a)(3).

J.T. testified that his mother began abusing him sexually when he was in kindergarten or first grade. J.T. testified that sometime during this period, he woke up on the couch and his mother was drunk, naked, and on top of him, trying to have sex with him.

J.T. described several instances of sexual abuse between ages 5 and 15, including the three incidents for which Trout was charged and ultimately convicted. One of these incidents involved penile-vaginal sex that J.T. testified took place about two weeks before Trout's 2009 felony DUI arrest. J.T. testified that in the second incident, which occurred around the same time, Trout hit him several times and then performed oral sex on him. In the third incident, which occurred around Halloween 2008, J.T. testified that Trout tried to have sex with him by unzipping his pants and pulling out his penis, but he pushed her away.

J.T. also testified that his mother initiated sexual acts or attempted sexual intercourse with him about once a month, but he never told his brothers because he did not want them to think she was a bad person. J.T. stated that he never reported the sexual abuse because he did not think anyone would believe him.

In addition to J.T.'s testimony, the jury also heard the entire *Glass* warrant conversation between J.T. and Trout in which J.T. confronted Trout with his allegations of sexual abuse. The jury also heard the recorded interview between Trout and Detective Sarber.

The defense theory at trial was that J.T.'s father manipulated J.T. to falsely accuse Trout of sexually abusing him. The defense emphasized that Dunovan hated Trout, had previously physically abused Trout, and had a pattern of deflecting attention from his own bad behavior by accusing others of bad behavior. The defense also emphasized that Dunovan had a financial motive to manipulate J.T. to accuse Trout of these serious crimes, because it would ensure that the children never returned to Trout

and Dunovan would not have to pay child support. Lastly, the defense asserted that J.T.'s accounts of the sexual abuse were not credible, given how much bigger he was than his mother and given how long he waited to report this alleged conduct.

Trout testified in her own defense. In her testimony, Trout admitted to her prior alcohol abuse and her history of sobriety followed by relapse. She also admitted to drinking to the point of blacking out, even when her children were present. She testified that she was afraid of Dunovan and that he was a violent person who was not truthful and who had threatened to take the children from her.

Trout denied physically abusing her children. She admitted to spanking them with her hand when they were small, but she testified that she never hit them with any object.

Trout also denied sexually abusing J.T. She testified that the very idea of her having sex with J.T. was "horrible." When questioned about her ambiguous statements on the *Glass* recording and to the detective, Trout said she felt sheer terror that she was going to jail and that she might have "done this." She explained that because of her drinking during 2009, she would not have been able to "refute anything." At one point, she was directly asked if she thought she might have sexually abused her son while in a black-out; Trout said "yes."

The jury found Trout guilty on all three counts of sexual abuse of a minor. Following a sentencing hearing, Trout received a composite sentence of 31 years to serve.

Trout now appeals her convictions and her sentence.

*Trout's claim that the court committed plain error by allowing her to testify
at trial without first securing a knowing and voluntary waiver of her right
not to take the stand*

Alaska Criminal Rule 27.1 requires the trial court to advise defendants of their right to choose whether to testify or remain silent. At the beginning of trial, the court advised Trout that she had this right. The court continued:

> And I'm not asking you to make this decision now, ma'am.
> I want you to talk to both [your attorneys] before making this
> decision. I only want to advise you at this time it's your right
> to choose whether you're going to testify or remain silent.
> Do you understand that right?

Trout's response was "yes." About ten days later, during trial, Trout's counsel told the court that Trout had been ill but seemed to be feeling better. The next day, Trout's attorneys called her to testify. The court made no further advisement or inquiry regarding Trout's decision to testify. Nor did Trout's attorneys request any such additional advisement or inquiry.

Now on appeal, Trout argues that the trial court committed plain error when it failed to conduct an on-the-record inquiry, outside the presence of the jury, into Trout's decision to waive her right to silence and to testify at her trial.[4] Trout argues that we should adopt a new procedural rule requiring trial judges to make such an on-the-record inquiry in every case where the defendant chooses to testify so as to ensure that the defendant's decision to testify is knowing and voluntary.

More than twenty-five years ago, in *LaVigne v. State*, the Alaska Supreme Court adopted a related procedural rule that applies to cases where the defendant does

---

[4] *See Adams v. State*, 261 P.3d 758, 764 (Alaska 2011).

*not* testify.[5]  This procedural rule was later codified in Alaska Criminal Rule 27.1(b), which provides:

> If the defendant has not testified [when the defense attorney announces that the defense intends to rest], the court shall ask the defendant to confirm that the decision not to testify is voluntary.  This inquiry must be directed to the defendant personally and must be made on the record outside the presence of the jury.[6]

This mandated inquiry is often referred to as the *LaVigne* rule.

Trout now proposes that we create a parallel rule that would require trial judges to conduct an inquiry in all cases where the defendant chooses to take the stand at trial, to ensure that the defendant's decision to testify is knowing and voluntary.  We conclude that such a rule is not necessary.

Our supreme court adopted the *LaVigne* rule because defense attorneys would frequently advise, or even directly instruct, their clients not to take the stand — and would neglect to inform these defendants that, as a matter of law, criminal defendants have the right to take the stand at trial regardless of whether their attorneys think it is advisable.[7]  Thus, the *LaVigne* rule was intended to forestall defense attorneys from intentionally or even inadvertently "usurping" control of their clients' right to testify.[8]  It was also intended to assist courts in any future appellate and post-conviction

---

[5]  *LaVigne v. State*, 812 P.2d 217 (Alaska 1991).

[6]  Alaska R. Crim. P. 27.1(b).

[7]  Alaska R. Prof. Conduct 1.2(a).

[8]  *LaVigne*, 812 P.2d at 220-21.

litigation "by requiring the trial judge to make an on-record memorial of a decision that is normally made in private discussions between attorney and client."[9]

A minority of other jurisdictions have adopted rules similar to the rule announced in *LaVigne*.[10] As the Colorado Supreme Court has explained, these rules are useful because of the unique risk in criminal cases that defense attorneys "acting in good faith and with a zeal to prevent the client's conviction, might overbear [their client's] desire to testify."[11]

But none of these courts have extended this rule to defendants who choose to testify. Courts that have addressed this issue have concluded that the danger of unlawful usurpation is significantly less in circumstances where the defendant takes the stand.[12] Alaska post-conviction cases likewise do not reveal a particular danger that criminal defendants are being forced to testify against their will because of defense attorney coercion or pressure.[13]

---

[9] *Id.*; *see also Hurn v. State*, 872 P.2d 189, 198 (Alaska App. 1994) ("A failure to comply with the *LaVigne* rule is harmful, not because that failure by itself proves that a defendant's constitutional right was abridged, but because the failure makes it harder to determine the facts underlying the defendant's [post-conviction] claim of constitutional violation.").

[10] *See, e.g.*, *People v. Curtis*, 681 P.2d 504, 513-14 (Colo. 1984); *Tachibana v. State*, 900 P.2d 1293, 1303 (Haw. 1995); *State v. Orr*, 403 S.E.2d 623, 624-25 (S.C. 1991) *overruled on other grounds by Franklin v. Catoe*, 552 S.E.2d 718, 725 (S.C. 2001); *State v. Neuman*, 371 S.E.2d 77, 82 (W. Va. 1988).

[11] *People v. Mozee*, 723 P.2d 117, 124-25 (Colo. 1986)*.*

[12] Both the Hawaii Supreme Court and the Colorado Supreme Court have rejected proposals similar to the one presented here. *See, e.g.*, *State v. Lewis*, 12 P.3d 1233, 1237 (Haw. 2000); *Mozee*, 723 P.2d at 124-25.

[13] In contrast, claims that the defendant wanted to testify but was coerced into remaining silent continue to be brought in post-conviction cases. *See, e.g.*, *Davis v. State*, 2015 WL

(continued...)

Nor does Trout assert that she was personally subjected to this kind of unlawful pressure or coercion by her attorney. Instead, Trout simply asserts — without citation to any legal or factual authority — that defendants who do not wish to testify are being pressured by their attorneys to take the stand.

Neither historical experience nor the record in this case gives us any reason to adopt the broad procedural rule that Trout proposes. And we note that Trout's proposed judicial inquiry might well have a chilling effect on a defendant who has chosen to take the stand, especially against their attorney's advice. Despite the intended limited scope of such an inquiry,[14] the defendant may nevertheless perceive the judge's advisement and questioning, not as inquiry into the *voluntariness* of the defendant's decision to testify, but rather as an implied comment on the *advisability* of the defendant's decision.

Accordingly, we find no plain error in the trial court's failure to *sua sponte* inquire into the voluntariness of Trout's decision to testify in this case.

---

[13] (...continued)
4503986 (Alaska App. July 22, 2015) (unpublished); *Jordan v. State*, 2014 WL 355921 (Alaska App. Jan. 29, 2014) (unpublished); *Thornton v. State*, 2012 WL 3139577 (Alaska App. Aug. 1, 2012) (unpublished); *Welton v. State*, 2011 WL 2151850 (Alaska App. May 25, 2011) (unpublished).

[14] *Cf. Mute v. State*, 954 P.2d 1384, 1386 (Alaska App. 2004) (emphasizing limited nature of *LaVigne* voluntariness inquiry).

*Trout's argument that the trial court should have instructed the jury to presume that the detective's shredded notes would have been favorable to Trout*

As already recounted, Detective Sarber met with J.T. to prepare J.T. for a recorded phone conversation with his mother. As part of this preparation, Sarber and J.T. brainstormed and prepared questions that could be raised during the phone call. In his testimony, Sarber described these notes as handwritten bullet points on a legal pad.

J.T. and Sarber both testified that Sarber used the notes to direct J.T. to ask specific questions and told J.T. what to say, but told him to say it "in his own words." Sarber also testified that, during the phone call, he wrote notes to J.T. and directed J.T. when to ask certain questions listed in the notes. Sarber acknowledged that it was his idea to have J.T. ask his mother whether she also sexually abused his brothers. Sarber also acknowledged that, because of J.T.'s youth, J.T. read some of the notes aloud *verbatim* during the phone call.

Sarber also testified that, in keeping with the Anchorage Police Department's practice at the time, he shredded his notes after the phone call. (Sarber futher testified that Department policy has changed and he now assiduously keeps such investigative notes.) Because Sarber had destroyed his handwritten notes, Trout requested that the jury be instructed, pursuant to *Thorne v. State, Department of Public Safety*, that the jury should presume that the notes, had they been preserved, would have been favorable to the defense.[15]

The superior court declined to give the full *Thorne* instruction requested by the defense. Instead, the court instructed the jury with a "partial" *Thorne* instruction. That is, the superior court instructed the jury that the detective's missing notes constituted evidence that "should have been preserved and made available to Ms. Trout"

---

[15]  774 P.2d 1326, 1331-32 (Alaska 1989).

and the jury therefore "may presume that the notes, had they been preserved, would have been favorable to Ms. Trout." Trout argued that the term "may" should be changed to "must" presume because the presumption under *Thorne* (although rebuttable) is mandatory. The court refused this request.

On appeal, Trout argues that the court erred in using "may" presume rather than "must" presume. She claims that, without this stronger directive, the jury might not have understood that they were required to presume that the missing evidence would have been favorable to her — that is, they would not have understood that they should presume that the missing notes would have supported her claim that J.T. was easily manipulated and her claim that the recorded conversation between herself and J.T. was being controlled and manipulated by the detective.

But there was no real dispute on either of these claims. At trial, Sarber readily admitted that he had created the questions J.T. asked his mother and that he actively coached J.T. through the conversation. Similarly, both J.T. and Sarber testified that J.T. was essentially reading a script during the call, rather than relying on his own thoughts or expressions. Given these circumstances, we conclude that the jury's consideration of the missing notes would not have been impacted by the use of the word "may" rather than "must." Thus, any error in using one term over another in the *Thorne* instruction is harmless.

> *Trout's argument that the trial court erred in excluding evidence of additional domestic violence by Dunovan*

At trial, Trout's defense focused largely on the theory that Dunovan exerted power and control over "virtually every person" in his life. Trout's attorney argued that this past history demonstrated how and why Dunovan would have pressured J.T. into making false sexual abuse allegations against Trout. Trout's attorney also argued that

Dunovan pressured J.T. into making these false allegations to deflect police attention from his 2009 abuse of his wife Michelle and to ensure that he would gain custody of his sons and not have to pay child support.

In support of this defense, Trout's attorney sought to introduce evidence of Dunovan's various acts of domestic violence against Trout and the children in 2000 and 2001, as well as his more recent acts of domestic violence against Michelle.

The superior court allowed some, but not all, of this evidence to be introduced. For example, the court allowed Trout to testify that she was afraid of Dunovan and that he had beaten her in the past. She was also allowed to describe his violent behavior during the 2002 divorce, his threats to take the children, and the fact that she obtained restraining orders against Dunovan. The court also allowed Trout to elicit detailed information about Dunovan's more recent acts of domestic violence against his wife Michelle.

But the court limited Trout's ability to introduce detailed information about Dunovan's past violence towards her and the children. For example, the court precluded testimony about how Dunovan threatened his younger son Z.T. when Z.T. was eighteen months old and that he spanked J.T. as a child "more than he needed to." The court also precluded detailed testimony about an incident shortly after their divorce, in which Dunovan defaced Trout's home by spreading mustard and ketchup everywhere, as well as another incident that occurred a month later in which Dunovan kicked in a boarded-up window in Trout's home, entered the home, and took Trout's phone.

On appeal, Trout argues that the trial court's limitation of her defense evidence was error under this Court's decision in *Beltz v. State*[16] because the jury needed to know the intensity of Dunovan's animosity toward her in order to fairly weigh

___

[16]   895 P.2d 513 (Alaska App. 1995).

Dunovan's credibility and J.T.'s vulnerability to his father's influence, and to understand the potential source of J.T.'s sexual abuse allegations.

In *Beltz*, the defendant was convicted of sexually abusing his minor daughter. At trial, Beltz sought to cross-examine his wife regarding a prior incident where she had assaulted him with a weapon.[17] The trial court excluded this evidence under Alaska Evidence Rule 403, ruling that the jury had already heard evidence about how rocky the Beltz marriage had been for sixteen years, and that evidence of the wife's assault against Beltz from six years before would not materially help the jury decide the case and would instead distract them with collateral issues.[18]

Beltz argued on appeal that the trial court erred in limiting his cross-examination in this manner. He argued that evidence of this violent confrontation was needed because it showed the intensity of Ms. Beltz's response when her husband threatened to take the children from her, and therefore supported his defense that she had influenced her daughter to concoct a false report of sexual abuse to obtain custody of the children.[19]

We concluded that the trial court abused its discretion in excluding this evidence because the evidence of the violent assault was materially different from the other evidence about their "rocky" marriage, and the excluded evidence revealed important information about the child custody issue and the extent of Ms. Beltz's anger toward her husband.[20] We noted that the proffered evidence was not unfairly prejudicial and there was little reason to believe that Beltz's trial would be side-tracked by a "mini-

---

[17] *Id*. at 517-18.

[18] *Id.*

[19] *Id.* at 518.

[20] *Id.*

trial" on this issue.[21] We also noted that, although the violence had occurred six years before, the time frame supported the inference argued by the defense attorney that Ms. Beltz had abandoned her prior violence toward her husband in favor of a more sophisticated scheme to obtain custody of the children by manufacturing allegations of sexual abuse.[22]

Trout argues that her case is similar to *Beltz* and that her theory of defense was similarly weakened by the absence of the evidence showing the extent of her ex-husband's animosity and violence towards her.

As an initial matter, we agree with Trout that the *Beltz* decision was intended to set a low threshold for this type of defense evidence and the *Beltz* holding was intended to ensure that trial judges give defendants a fair opportunity to introduce background information of witness bias or motive that will help the jury understand their theory of defense. We also agree with Trout that the judge's rulings in this case did not necessarily reflect a proper understanding of *Beltz*.

However, we do not find reversible error here. Trout's theory of defense was that Dunovan had manipulated J.T. to falsely accuse Trout of sexual abuse. At trial, Trout's jury heard a fair amount of evidence about Dunovan's controlling, manipulative, and vengeful nature. The jury also heard evidence about the lengths Dunovan would go to try to obtain custody of his children, and his tendency to deflect attention from his bad behavior by accusing others. Although there was other evidence about Dunovan's past relationship to Trout that perhaps should also have been admitted, we conclude that the jury had an adequate context in which to evaluate her theory of defense, and the

---

[21]  *Id.* at 519.

[22]  *Id.*

court's exclusion of this evidence did not materially impede Trout's ability to present her case.

*Trout's argument that the trial judge erred by sentencing her to an active term of imprisonment beyond the presumptive term for first felony offenders*

At the time of sentencing, Trout was thirty-nine years old. Because Trout committed the sexual abuse in this case before her 2009 felony DUI, the superior court considered her a first felony offender for presumptive sentencing purposes.[23] Trout therefore faced the following presumptive ranges: 20 to 30 years for Count I and Count II (first-degree sexual abuse of a minor), and 5 to 15 years for Count III (second-degree sexual abuse of a minor).[24]

The court ultimately imposed the following sentences: 28 years with 5 years suspended for Count I, 28 years with 5 years suspended for Count II (with 7 years consecutive to the first sentence), and 8 years with 3 years suspended for Count III (with 1 year consecutive to the other sentences). Thus, Trout's composite sentence was 31 years to serve with an additional 5 years suspended.

Trout argues that this sentence is clearly mistaken because it exceeds by 1 year the high end of the 30-year presumptive range for her most serious offense, first-degree sexual abuse of a minor, without an explicit finding of good cause to do so.

In *Lacquement v. State*, we held that when a court sentences a defendant for multiple offenses, the defendant's composite sentence can only exceed the presumptive term for the defendant's most serious offense if the court finds that a sentence of that

---

[23] AS 12.55.145.

[24] AS 12.55.125(i)(1)(A)(ii), (3)(A).

length is necessary to protect the public.[25] However, as Trout acknowledges, we later concluded that although this benchmark is not to be exceeded without good reason, "the appropriate focus is no longer on the narrow issue of public danger, but rather on whether a composite sentence exceeding the presumptive term is warranted under the totality of the circumstances."[26]

Here, the record indicates that the judge's decision to impose 31 years to serve was based on the judge's evaluation of the totality of the circumstances and the relevant *Chaney* criteria. In his sentencing remarks, the judge focused specifically on the need for community condemnation and isolation. The judge did not view Trout's drinking as mitigating her conduct, finding instead that Trout had "very guarded" prospects for rehabilitation given her significant substance abuse history and past failures at treatment. The judge also focused on the long-term nature of the sexual abuse and the "untold harm" it had caused, and would continue to cause, Trout's son.

We have independently reviewed the record in this case.[27] Based on this review, we conclude that the composite sentence imposed in this case, as well as the judge's decision to exceed the high-end of the most serious offense by one year, was within the permissible range of reasonable sentences that other judges would impose under similar circumstances, and was therefore not clearly mistaken.[28]

---

[25] 644 P.2d 856, 862 (Alaska App. 1982), *superseded by statute as stated in Jones v. State*, 744 P.2d 410, 411 (Alaska App. 1987).

[26] *Farmer v. State*, 746 P.2d 1300, 1301-02 (Alaska App. 1987); *see also Jones*, 744 P.2d at 411-12.

[27] *McClain v. State*, 519 P.2d 811, 813-14 (Alaska 1974).

[28] *Id.; see also Farmer*, 746 P.2d at 1302.

*Conclusion*

The judgment of the superior court is AFFIRMED.