NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific Reporter*. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

RAFAEL LOPEZ MARTINEZ,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-13049
Trial Court No. 3AN-10-07995 CR

O P I N I O N

No. 2748 — May 19, 2023

Appeal from the Superior Court, Third Judicial District, Anchorage, Gregory A. Miller, Judge.

Appearances: Rachel Cella, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for the Appellant. RuthAnne Beach, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge ALLARD.

Rafael Lopez Martinez was convicted, following a jury trial, of second-degree sexual assault for engaging in sexual intercourse with a woman in the back seat

of his taxi cab while she was incapacitated from alcohol.[1]  The superior court sentenced Martinez to 15 years with 5 years suspended (10 years to serve) and 10 years' probation, a sentence in the middle of the presumptive range.  Martinez appeals his conviction and his sentence.

Martinez raises two claims of error with regard to his conviction.  Both claims relate to the fact that Martinez's trial was conducted with Spanish interpreters even though Martinez's native language is an indigenous language called Triqui.  Although Martinez never objected to the use of the Spanish interpreters at trial, he now argues that the trial court committed plain error by failing to secure a Triqui interpreter and by failing to inquire into whether Martinez's decision not to testify was related to his inability to speak English or Spanish fluently.  According to Martinez, the absence of a Triqui interpreter rendered his waiver of his right to testify involuntary.  Martinez also argues that the trial court erred in failing to adequately explain his right to testify, thereby rendering his waiver of his right to testify invalid.  Based on the record before us, we reject both of these claims.

Martinez also raises two claims with regard to his sentence.  First, he argues that the trial court sentenced him under a legally incorrect understanding of the relevant presumptive range.  Martinez bases this argument on comments that the trial court made that suggested that the trial court may have erroneously believed that the middle of the presumptive range is the default active term of imprisonment for a typical offender committing a typical offense that is neither aggravated nor mitigated.  We agree that such a view would be inconsistent with the legislative intent behind the creation of presumptive ranges, the principle of parsimony, and due process.  Because the record is not clear as to whether the court was operating under this mistaken understanding of the

---

[1]  *See* former AS 11.41.420(a)(3)(B) and/or (C) (2010).

law, we remand this case to the superior court for clarification of the basis for the sentence and, if appropriate, a resentencing.

Second, Martinez argues that a probation condition requiring him to take medications prescribed as part of a residential treatment program was not validly imposed. The State concedes that a remand for further findings is required for this condition. We agree that this concession is well-founded.[2]

*Factual background*

In March 2010, Martinez was employed as a taxi driver for Anchorage Yellow Cab. On March 19, a woman (I.C.) reported to the Anchorage Police Department that a taxi driver sexually assaulted her earlier that day while she slept in the back of his cab. A sexual assault examination was performed on I.C., which revealed the presence of sperm in her vagina.

According to I.C., she had gotten into the taxi in the early morning hours after a night of drinking, and she had fallen asleep during the ride to her apartment. When she woke up, she was naked from the waist down, and the driver was in the backseat with her. I.C. testified that she confronted the driver and asked what he was doing and he backed away, but did not respond. The driver got back into the driver's seat and drove her to her apartment. I.C. asked the driver the number of the cab. He told her "40" although she noticed it was 57 when she got out. Martinez was later identified as the driver of cab 57.

The record indicates that Martinez is originally from a mountainous region in Oaxaca, Mexico, and that his native language is an indigenous language called Triqui.

_____

[2] *See Marks v. State*, 496 P.2d 66, 67-68 (Alaska 1972) (requiring an appellate court to independently evaluate any concession of error by the State in a criminal case).

Witnesses at trial later testified that, although Martinez has lived in Alaska since the 1990s, his English is very limited; Martinez also has some difficulty with understanding Spanish and articulating himself in Spanish.

As part of their investigation, the police interviewed Martinez in Spanish with a detective serving as an interpreter. At times, Martinez had difficulty understanding certain Spanish terms. He also had some difficulties expressing himself in Spanish, sometimes taking long pauses before answering a question. Martinez told the officers that because the interview was conducted in Spanish, "sometimes he couldn't think as fast."

In the interview, Martinez initially denied any memory of picking up I.C. and he denied having sexual relations with her. The police asked Martinez to provide a DNA sample, which he voluntarily did. After providing the DNA sample, Martinez's version of events changed. Martinez then stated that he remembered picking up a woman with whom he later had sex.

Martinez said that he had sexual relations with the woman but that she was awake the whole time. Martinez stated that she had taken off her pants and initiated the sexual encounter by getting close to him. He alternatively stated that she had urinated on herself and that was why she took off her pants. The detectives accused Martinez of lying about the woman being awake. Martinez insisted that the woman had been awake and that she was not mad at him. When asked why he did not initially tell the truth, Martinez said that he was nervous and worried about his job and his family.

Later DNA testing indicated to a reasonable degree of forensic certainty that Martinez was the source of the sperm found during the sexual assault examination of I.C. A grand jury subsequently indicted Martinez on one count of second-degree

sexual assault (sexual penetration of a person who is incapacitated and/or unaware that a sexual act is being committed).[3]

*Trial proceedings*

Although the Alaska Public Defender Agency was initially appointed to represent Martinez, he later retained an attorney. The private defense attorney raised the issue of Martinez's language difficulties during a pretrial status hearing. According to the attorney, Martinez did not have "much facility in any of the languages that we talk including Spanish." The attorney stated that he had tried to find a Triqui interpreter but had been unable to locate one. He explained that he had been communicating with Martinez in Spanish through Martinez's pastor who was from Cuba. The attorney's intention was to use the pastor as the trial interpreter because of his long-standing relationship with Martinez and because Martinez did not have funds for a certified interpreter.[4]

The trial court expressed hesitation about using a non-certified interpreter. Instead, the trial court obtained the services of two certified Spanish interpreters at court expense. The trial court explained to Martinez that the pastor could also attend trial and that Martinez could use the pastor during breaks to communicate with his attorney. There was no objection to this plan.

---

[3] Former AS 11.41.420(a)(3)(B) and/or (C) (2010) ("An offender commits the crime of sexual assault in the second degree if . . . the offender engages in sexual penetration with a person who the offender knows is . . . incapacitated; or . . . unaware that a sexual act is being committed.").

[4] At the time, the party requiring the interpretation services was required to bear the costs. *See* former Alaska R. Admin. P. 6(b)(2) (2011). Alaska Rule of Administrative Procedure 6(b) has since been amended and presently the court system bears the cost of interpretation services.

At the beginning of trial, the trial court checked with the first Spanish interpreter to make sure that Martinez was understanding the interpreter.[5] The interpreter confirmed that Martinez understood him and that he and Martinez had been able to communicate with one another.

Through the Spanish interpreter, the trial court then advised Martinez of his right to testify and the court made clear that Martinez did not need to make a decision at that moment. Martinez appeared to indicate his understanding of this advisement.

At trial, the defense attorney highlighted Martinez's lack of facility with both English and Spanish. The attorney argued that Martinez's conduct in the police interview was a result of Martinez's language difficulties and naivety rather than evidence that he was lying, as the prosecutor claimed.

To support the defense attorney's argument that Martinez had difficulties with Spanish, the defense called Martinez's pastor to testify. The pastor testified that Martinez has a hard time understanding both English and Spanish. He explained that he and other church members were able to communicate with Martinez in Spanish by speaking slowly, modifying their vocabulary, and repeating themselves quite a bit.

After the pastor's testimony, the defense attorney informed the trial court that Martinez had chosen not to testify. The court then conducted the required *LaVigne* inquiry to make sure that Martinez understood that he had a right to testify and that this right belonged to him, not his attorney.[6] After giving Martinez additional time to consult

---

[5]    There was one Spanish language interpreter for the first two days of trial and two Spanish language interpreters for the last three days.

[6]    *LaVigne v. State*, 812 P.2d 217, 222 (Alaska 1991) (holding that "judges should make an on-the-record inquiry after the close of the defendant's case, although out of the jury's hearing, into whether a nontestifying defendant understands and voluntarily waives [their] right [to testify]"); Alaska R. Crim. P. 27.1(b) ("If the defendant has not testified, the court

(continued...)

with his attorney and checking with the interpreter to make sure that there were no interpretation issues, the trial court found that Martinez had knowingly and voluntarily waived his right to testify. (A more detailed description of the *LaVigne* inquiry is provided below.)

Following deliberations, the jury convicted Martinez of second-degree sexual assault.

*Sentencing hearing*

At sentencing, Martinez provided the following statement through a Spanish interpreter:

> Whenever — this is what I want to say. Whenever that woman asked me to get in my car, she was not very drunk. She actually got in my car. She was doing sort of well. And she asked me to bring her to her apartment. I did that. Then she asked me to bring her to Mountain View and I took her to Mountain View. And then when we got there, she knocked on the door, but nobody opened the door. And then I brought her back to her apartment, and she showed me her breasts. That was the reason — that's how it all started.
>
> And she also wanted me to drink with her. She wanted me to buy beer with her but I told her that the liquor stores weren't open and so we didn't — we did not go to buy it. And then we — yes, I was with her in the car, but it was only for 20 minutes and she said that I hit her, but I did not hit her. She only spoke loud and the thing that she offered me her body, that's — yes, she did that, but that was it. What I think

---

6 (...continued)
shall ask the defendant to confirm that the decision not to testify is voluntary. This inquiry must be directed to the defendant personally and must be made on the record outside the presence of the jury.").

is that whenever she went to her apartment, she had more beer and she probably drunk more beer. That's everything.

As a defendant with no prior felony convictions, Martinez faced a presumptive range of 5 to 15 years for his conviction.[7] At sentencing, Martinez's attorney emphasized Martinez's lack of a prior criminal history and his good prospects for rehabilitation, and argued that Martinez should receive a sentence at the low end of the presumptive range.

In contrast, the State argued for 10 years to serve on the ground that Martinez's case was "more serious" than the typical case because Martinez was a taxi cab driver who had violated the trust society placed in him to keep vulnerable passengers safe. The State acknowledged that it was requesting an active term of imprisonment in the middle of the presumptive range rather than at the bottom of the range, but it explained that the State's intent was to ensure that the time to serve was "substantial enough" to have a deterrent effect.

The trial court imposed a sentence of 15 years with 5 years suspended (10 years to serve) and 10 years' probation.

No notice of appeal was filed.


*Post-conviction relief proceedings*

Martinez filed a timely application for post-conviction relief in which he argued, *inter alia*, that his trial attorney's failure to file a notice of appeal constituted ineffective assistance of counsel. The superior court agreed, and granted Martinez relief on this post-conviction claim.[8] This appeal then followed.

---

[7] *See* AS 12.55.125(i)(3)(A).

[8] Martinez also raised other post-conviction relief claims that were denied. Martinez
(continued...)

*Martinez's argument that he did not voluntarily waive his right to testify because he was not given the opportunity to testify in his native language*

Martinez argues that his conviction should be reversed because the trial court "fail[ed] to accommodate Martinez's language barrier." According to Martinez, the trial court should have obtained a Triqui interpreter for Martinez, or, at the very least, should have inquired into whether Martinez's decision not to testify was related to his inability to speak Spanish or English fluently. Martinez argues that the failure to conduct such an inquiry or to provide a Triqui interpreter rendered his waiver of his right to testify involuntary.

There are multiple problems with this argument. First, there is nothing in the record currently before us to suggest that a Triqui interpreter was available for trial. Martinez's trial attorney claimed to have looked for a Triqui interpreter but was unable to find one. The trial court was entitled to rely on this representation, particularly in the absence of any objection to proceeding with Spanish interpreters.

Second, there is nothing in the record currently before us to indicate that Martinez would have chosen to testify if a Triqui interpreter had been available; nor is there anything to suggest that the absence of such an interpreter played a role in Martinez's decision not to testify. Martinez argues that the trial court should have raised this issue *sua sponte* during the *LaVigne* inquiry. But the *LaVigne* inquiry is, by nature, a very limited inquiry.[9] As we explained in *Mute v. State*,

> [I]t is not a trial judge's function under *LaVigne* to question the defendant about their reasons for declining to take the

---

[8]   (...continued)
challenged the denial of his other post-conviction relief claims in a separate appeal. *See Martinez v. State*, 2023 WL 3093454 (Alaska App. Apr. 26, 2023).

[9]   *Mute v. State*, 954 P.2d 1384, 1386-87 (Alaska App. 1998); *Trout v. State*, 377 P.3d 296, 300 (Alaska App. 2016).

stand. A judge must advise the defendant that the choice rests with them, but the judge need not question the defendant to make sure that they have fully considered their options, that they have received competent advice from their attorney, and that they are making an informed choice.[10]

Indeed, as we have previously noted, a *LaVigne* inquiry can quickly become "conceptually troublesome" if trial courts treat the inquiry as akin to the type of in-depth examination that should accompany a defendant's waiver of other constitutional rights, such as the right to counsel.[11] One primary concern is the potential coerciveness of such in-depth questioning, which could be viewed by the defendant as an implied criticism of the defendant's decision not to testify rather than the simple inquiry that the *LaVigne* inquiry is intended to be.[12]

We therefore reject Martinez's argument that the trial court should have intruded into the attorney-client relationship by *sua sponte* questioning Martinez about *why* he had chosen not to testify, and whether a Triqui interpreter would have made a difference to that decision.

Lastly, we note that the current record does not support Martinez's claim that he required a Triqui interpreter to testify. As already pointed out, neither Martinez nor his attorney objected to the use of the Spanish interpreters. Moreover, Martinez was willing to use one of his previous Spanish interpreters for his allocution at sentencing.

---

[10] *Mute*, 954 P.2d at 1387.

[11] *Id.* at 1386-87 (quoting *Knix v. State*, 922 P.2d 913, 918 n.6 (Alaska App. 1996)).

[12] *Id.* at 1387; *Knix*, 922 P.2d at 918 n.6 (discussing the necessary limitations of the *LaVigne* inquiry); *Trout*, 377 P.3d at 300 (reviewing how despite the limited scope of a judicial inquiry, a "defendant may nevertheless perceive the judge's advisement and questioning, not as inquiry into the *voluntariness* of the defendant's decision to testify, but rather as an implied comment on the *advisability* of the defendant's decision" (emphasis in original)).

Notably, courts in other jurisdictions have upheld convictions under similar circumstances.[13]

Accordingly, based on the record currently before us, we reject Martinez's claim that his decision not to testify was rendered involuntary by the absence of a Triqui interpreter.

*Martinez's argument that he did not knowingly waive his right to testify because the trial court's explanation of the right to testify was inadequate*

Martinez also argues that his waiver of his right to testify was not "knowing" because (according to Martinez) the trial court failed to adequately explain that he had a personal right to testify. Martinez argues specifically that the trial court failed to adequately define the term "testify."

At the beginning of the *LaVigne* inquiry, Martinez expressed confusion over the word "testify." The trial court then provided the following explanation:

---

[13]  *See, e.g.*, *Falak v. State*, 583 S.E.2d 146, 149-50 (Ga. App. 2003) (finding no violation of right to testify and to meaningfully participate in trial when defendant spoke a different dialect of Arabic than the Syrian interpreter, but interpreter said he understood defendant and defendant did not express any difficulty understanding translations and even asked for him to interpret again); *People v. Warcha*, 792 N.Y.S.2d 627, 628-29 (N.Y. App. Div. 2005) (finding defendant's proficiency in Spanish sufficient to allow him to proceed to trial with Spanish interpreters, despite fact that defendant's native language was Quiche, a Guatemalan dialect, because interpreters felt they could communicate, and there was evidence that the defendant had been speaking Spanish with co-workers for previous two years and that he had been taught partly in Spanish in his native country); *Martins v. State*, 52 S.W.3d 459, 470, 471-73 (Tex. Crim. App. 2001) (affirming conviction of native-Portuguese speaker who received Spanish interpreter at trial because he never requested a Portuguese interpreter or objected to receiving a Spanish interpreter and there was significant evidence that he regularly communicated in Spanish); *cf. Tsen v. State*, 176 P.3d 1, 10 (Alaska App. 2008) (affirming trial court's denial of any interpreter for native-Vietnamese speaking defendant after finding that he had a sufficient grasp of English to understand the trial, even if he did not understand "some of the nuances of the [English] language").

*Court*: Okay, "testify" means to come up here to the witness stand and tell the jury in your own words, you personally, to answer questions presented by your attorney. Testifying is what all of the witnesses in your case have done so if you were to testify you would be sworn in, meaning take the oath as a witness to tell the truth.

[Your attorney] would then ask you questions and you would answer his questions with the jury here, the jury would hear you, and then the attorneys for the State . . . would be able to ask you questions, what we call cross-examination, and then [your attorney] would have the right to ask you follow-up questions. That is what "testifying" means and that is what you've seen with all the other witnesses in your case do.

On appeal, Martinez criticizes this explanation as "ungrammatical" and "confusing." But Martinez ignores the fact that, following this explanation, the court provided Martinez with unlimited time to consult with his attorney and the interpreters regarding any questions he might have about his right to testify. The court also provided Martinez with a preview of the questions that it would ask as part of the *LaVigne* inquiry, and the court expressly told Martinez that the decision of whether he should testify belonged to him alone, not his attorney:

*Court*: You could take as long a break as you need to speak with your attorney and the translators can help you, and when you come back I will ask you personally if it is your decision to testify or not testify; the choice is yours[.] [Y]ou can do either, and it is only your choice. It's not [your attorney]'s choice; it's yours and when you come back from the break after you've been able to speak more with [your attorney], I'll ask if you've discussed this with [him].

I'll ask you if anyone has promised you anything or threatened you in any way to convince you to make whatever decision you make. And I will ask you if you are sick or if

– 12 –

you are under the influence of any alcohol or drugs or any medication. So those are the questions I'll ask when we come back from a break. Okay?

    *Martinez*: It's okay.

    *Court*: Do you understand all that?

    *Martinez*: Yes. I understand.

When the parties returned from the break, Martinez did not express any further questions or concerns. The following exchange then occurred:

    *Court*: At the beginning of the case I advised you that you have the right to choose whether to testify or to remain silent at this trial, do you remember that?

    *Martinez*: Yes.

    *Court*: [Y]our attorney[] has just said that you have decided not to testify, is that your decision?

    *Martinez*: Yes.

    *Court*: Your personal decision?

    *Martinez*: Yes.

    *Court*: And that's your voluntary decision.

    *Martinez*: Yes.

    *Court*: Have you discussed your decision with [your attorney]?

    *Martinez*: Would you repeat again?

    *Court*: Sure, have you discussed your decision with [your attorney]?

    *Martinez*: Yes.

    *Court*: Okay. Has anyone promised you anything to make this decision?

    *Martinez*: No.

> *Court*: Has anyone threatened you in any way to convince you to make this decision?
>
> *Martinez*: No.
>
> *Court*: Are you sick?
>
> *Martinez*: No.
>
> *Court*: Are you under the influence of any drugs?
>
> *Martinez*: No.
>
> *Court*: Any medication?
>
> *Martinez*: No.
>
> *Court*: Or any alcohol?
>
> *Martinez*: No.

Following this exchange, the trial court checked with the Spanish interpreter to see if there had been any language difficulties. The interpreter confirmed that she was able to converse with Martinez and she indicated that she had translated everything that was said and she had gone "very slowly." The court subsequently found that Martinez had knowingly and voluntarily waived his right to testify.

On appeal, Martinez criticizes the above exchange as not a "true colloquy" and as inadequate to guarantee that Martinez understood his right to testify. In support of these criticisms, Martinez cites to *State v. Han*, a case from the Hawai'i Supreme Court, which held that a heightened level of care applies to the Hawaiian version of the *LaVigne* inquiry in cases that involve "language barriers."[14] Martinez argues that this Court should adopt a similar heightened level of care for *LaVigne* inquiries involving defendants who are not native English speakers.

---

[14] *State v. Han*, 306 P.3d 128, 137 (Haw. 2013), as corrected (July 10, and July 31, 2013).

We agree with Martinez that, as a general matter, a trial court should take extra steps to ensure that a defendant who is relying on an interpreter understands the *LaVigne* advisement. But the record shows that extra steps were taken here. After Martinez expressed confusion over the word "testify," the court explained that word. Additionally, the court gave Martinez an unlimited amount of time in which to consult with his attorney and the interpreter. And at the end of the colloquy, the court specifically checked with the interpreter to ensure that she was able to converse with Martinez through translating.

Martinez argues that the court should have done more to engage Martinez in the colloquy and he asserts that the court should have asked open-ended questions or requested that Martinez explain what the right to testify meant in his own words. While these actions may be needed in some cases, we do not find that they were required here. Unlike in *Han*, the trial court was careful to engage Martinez at each step of the advisement, and there was nothing about Martinez's responses after the break to suggest that he did not understand the advisement.[15] Indeed, the colloquy in this case appears remarkably similar to a colloquy that was cited approvingly by the Hawai'i Supreme Court in *Han*.[16]

---

[15] *See id.* at 130-31, 135.

[16] THE COURT: As I have discussed with you before the start of the trial, you do have the constitutional right to testify in your own defense, <u>You understand</u>?
THE DEFENDANT: Yes.
THE COURT: And although you should consult with [ ], your lawyer regarding your decision to testify, it is your decision and no one can prevent you from testifying if you chose to do so . . . <u>Do you understand</u>?
THE DEFENDANT: Yes.
THE COURT: And if you decide to testify, the prosecutor will be allowed to cross-examine you. <u>You understand that</u>?

(continued...)

Accordingly, we reject Martinez's challenges to the *LaVigne* inquiry.

*Martinez's challenge to his sentence*

As a defendant with no prior felony convictions, Martinez faced a presumptive range of 5 to 15 years for his conviction.[17] As already explained, the State requested that the trial court impose an active term of imprisonment of 10 years to serve on the ground that Martinez's case was "more serious" than the typical case because of Martinez's status as a taxi cab driver. The trial court agreed with the State's recommendation and imposed a sentence of 15 years with 5 years suspended (10 years to serve) and 10 years' probation.

On appeal, Martinez does not directly challenge his sentence as excessive. Instead, he argues that his case must be remanded for resentencing because he claims that the record shows that the trial court imposed his sentence under an erroneous understanding of the applicable presumptive range.

_____

[16] (...continued)
THE DEFENDANT: Yes.
THE COURT: You also have the constitutional right not to testify and to remain silent. You understand?
THE DEFENDANT: I understand.
THE COURT: And you understand that if you chose not to testify, that the jury will be instructed that it can not hold your silence against you in deciding your case.
THE DEFENDANT: I understand.
THE COURT: It's the understanding of the Court that you do not intend to testify in this case, is that correct?
THE DEFENDANT: That's correct.
THE COURT: And that's your decision.
THE DEFENDANT: Yes.
*Id.* at 136 n.6 (emphasis in original) (citing *State v. Christian*, 967 P.2d 239, 246-47 (Haw. 1998)).

[17] *See* AS 12.55.125(i)(3)(A).

Martinez bases his argument on some ambiguous comments that the court made during sentencing. Near the beginning of its sentencing remarks, the court noted that the presumptive range was 5 to 15 years, and the court also noted that "*further statutes say that 'presumptive' generally means the middle of the presumptive range* which means 10 years. That is exactly what the State is seeking."[18]

(The court's reference to "further statutes" appears to be a reference to AS 12.55.127(e)(3), which governs consecutive and concurrent sentencing and defines "presumptive term" to mean "the middle of the applicable presumptive range" for purposes of certain mandatory consecutive sentencing provisions. However, AS 12.55.127 was inapplicable to Martinez's case because he was only convicted of a single crime.)

On appeal, Martinez argues that the court's comment suggests that the court mistakenly believed that the legislature intended the middle of the presumptive range to be the default active term of imprisonment for the typical offender committing an typical offense that is neither aggravated nor mitigated. Martinez also points to another comment the court made later in its remarks, in which the court stated that "the state's recommendation *which is the midrange of the presumptive, which is really the statutory range*, is exactly right,"[19] as further confirmation that the court was operating under a mistaken understanding of the proper legal framework.

We agree that it would be error for a trial court to impose an active term of imprisonment in the middle of a presumptive range for a typical offender committing a typical offense that is neither aggravated nor mitigated. Such a sentence would be inconsistent with the rule of parsimony and the express legislative intent behind the 1978

---

[18] Emphasis added.

[19] Emphasis added.

creation of a presumptive sentencing scheme and the 2005 expansion of presumptive terms into presumptive ranges.

As a general matter, the intended purpose of presumptive sentencing is to "eliminat[e] disparity in the sentencing of similarly situated offenders and mak[e] criminal sentencing a predictable, internally consistent process."[20] As originally enacted in 1978, Alaska's presumptive sentencing scheme used presumptive terms — *i.e.*, a set term of imprisonment based on the level of offense and the defendant's prior felony convictions.[21] As we have previously explained, the presumptive term "represent[ed] the legislature's judgement as to the appropriate sentence for a typical felony offender (*i.e.*, an offender with the specified number of prior felony convictions, and with a typical background) who commits a typical act within the definition of the offense."[22]

For the most part, the presumptive terms were "intended as appropriate for imposition in most cases, without significant upward or downward adjustment."[23] As this Court explained in *Juneby v. State*: "The presumptive term should remain as the starting point of the analysis, and the *Chaney* criteria should be employed for the limited

---

[20]  *Juneby v. State*, 641 P.2d 823, 829-30 (Alaska App. 1982), *modified on other grounds*, 665 P.2d 30 (Alaska App. 1983); *see* SLA 1978, ch. 166, § 12; AS 12.55.005.

The Alaska legislature adopted presumptive sentencing in 1978 partly in response to a number of sentencing studies that had shown significant sentencing disparities between similarly situated offenders based on the identity of the sentencing judge and the race of the offender. Commentary to Alaska's Revised Criminal Code, 1978 Senate Journal Supp. No. 47 (June 12) at 148-49; *see, e.g.*, Beverly Cutler, *Sentencing in Alaska: A Description of the Process and Summary of Statistical Data for 1973*, at 175-76 (1975); Alaska Judicial Council, *Alaska Felony Sentencing Patterns: A Multivariate Statistical Analysis (1974-1976)*, at iii-iv (1977).

[21]  SLA 1978, ch. 166, § 12.

[22]  *Clark v. State*, 8 P.3d 1149, 1150 (Alaska App. 2000).

[23]  *Juneby*, 641 P.2d at 833.

purpose of determining the extent to which the totality of the aggravating and mitigating factors will justify deviation from the presumptive term."[24] Courts were encouraged to take a "measured and restrained approach" in the adjustment of presumptive sentences for both aggravating and mitigating factors so that the purposes of presumptive sentencing — enhancing reasonable uniformity and decreasing unjustified disparities — were not lost.[25]

In 2005, in response to the United States Supreme Court's decision in *Blakely v. Washington*,[26] the legislature replaced the former presumptive terms with presumptive ranges that generally began at the former presumptive term and then moved upwards in the amount of active and suspended time that could be imposed. In adopting presumptive ranges, the legislature made clear that its intent was "to preserve the basic structure of Alaska's presumptive sentencing system" while returning judicial sentencing discretion that had been "unduly constrain[ed]" by *Blakely*.[27] The legislature also made clear that it did not intend active terms of imprisonment to increase based on the

---

[24]   *Juneby*, 665 P.2d at 37.

[25]   *Juneby*, 641 P.2d at 833 ("Unless the provisions of AS 12.55.155 are adhered to strictly, and unless a measured and restrained approach is taken in the adjustment of presumptive sentences for both aggravating and mitigating factors, then the prospect of attaining the statutory goal of uniform treatment for similarly situated offenders would quickly be eroded, the potential for irrational disparity in sentencing would threaten to become reality, and the revised code's carefully fashioned system of escalating penalties for repeat offenders would be rendered utterly ineffective.").

[26]   *Blakely v. Washington*, 542 U.S. 296, 301-04 (2004) (holding that the Sixth Amendment prohibits a court from enhancing an otherwise maximum sentence based on facts that were not found by the jury beyond a reasonable doubt unless the facts were conceded by the defendant or based on the defendant's prior convictions).

[27]   SLA 2005, ch. 2, § 1.

conversion of presumptive terms to presumptive ranges.[28]  As the legislature's letter of intent stated:

> Although the presumptive terms are being replaced by presumptive ranges, it is not the intent of this Act in doing so to bring about an overall increase in the amount of active imprisonment for felony sentences.  Rather, this Act is intended to give judges the authority to impose an appropriate sentence, with an appropriate amount of probation supervision, by taking into account the consideration set out in AS 12.55.005 and 12.55.015.[29]

Thus, the legislative history indicates that the legislature intended the former presumptive term (*i.e.*, the low end of the presumptive range) to remain as "the starting point" for the court's sentencing analysis with regard to the active term of imprisonment.[30]

---

[28]  *See* Teresa W. Carns, *Alaska's Responses to the Blakely Case*, 24 Alaska L. Rev. 1, 15-17 (2007) (explaining that the 2005 creation of presumptive ranges was not intended to increase active terms of imprisonment but was instead intended to restore flexibility to the sentencing court, particularly with regard to the imposition of suspended time).

[29]  *Id.*

[30]  *Juneby*, 665 P.2d at 37 ("The presumptive term should remain as the starting point of the analysis, and the *Chaney* criteria should be employed for the limited purpose of determining the extent to which the totality of the aggravating and mitigating factors will justify deviation from the presumptive term." (quoting *Juneby*, 641 P.2d at 835 n.21)); *see also Clark v. State*, 8 P.3d 1149, 1150 (Alaska App. 2000) ("A presumptive term . . . represents the legislature's judgement as to the appropriate sentence for a typical felony offender (*i.e.*, an offender with the specified number of prior felony convictions, and with a typical background) who commits a typical act within the definition of the offense.") (citing *Mullin v. State*, 886 P.2d 1323, 1328 (Alaska App. 1994)).

This legislative intent is also consistent with the principle of parsimony, a well-established legal principle governing criminal sentencing.[31] As the Alaska Supreme Court explained in *Pears v. State*, the principle of parsimony requires that a defendant's liberty be restrained "only to the minimum extent necessary to achieve the objectives of sentencing."[32] This "least restrictive" principle is directly codified in federal law, and requires the sentencing court to "impose a sentence sufficient, but not greater than necessary," to serve the purposes of punishment.[33] Starting the active time to serve at the bottom end of a presumptive range and moving upwards only if an upwards departure is justified by one of the *Chaney* criteria is one way to ensure that the principle of parsimony is properly followed.[34]

---

[31]  *See Pears v. State*, 698 P.2d 1198, 1205 (Alaska 1985).

[32]  *Id.*; *see also Pickard v. State*, 965 P.2d 755, 760 (Alaska App. 1998) (explaining that "[t]he principle of parsimony . . . declares that, 'to the extent that there is any doubt [concerning the appropriateness of a defendant's sentence], that . . . doubt [should] be resolved in favor of a shorter, rather than a longer, sentence'" (alterations in original) (quoting *State v. Price*, 740 P.2d 476, 483 (Alaska App. 1987))).

[33]  18 U.S.C. § 3553(a).  The ABA Standards express the principle this way:  "The sentence imposed in each case should call for the minimum sanction which is consistent with the protection of the public and the gravity of the crime."  3 *ABA Standards for Criminal Justice* § 18-2.2(a), at 57 (2d ed. 1979); *see also ABA Standards for Criminal Justice: Sentencing* §§ 18-2.4, at 28 (3d ed. 1994) ("Sentences authorized and imposed, taking into account the gravity of the offenses, should be no more severe than necessary to achieve the societal purposes for which they are authorized."), 18-6.1(a), at 219 ("The sentence imposed should be no more severe than necessary to achieve the societal purpose or purposes for which it is authorized."); *Model Penal Code* § 1.02(2)(a)(iii) (Proposed Final Draft 2017).

[34]  This is not to say that a sentencing court's failure to expressly state that it has followed this parsimonious approach constitutes error.  Rather, in the absence of direct evidence to the contrary, it will generally be assumed that the sentencing court is following the rule of parsimony and is imposing the lowest sentence that the court believes will satisfy the *Chaney*

(continued...)

In the current case, some of the trial court's comments suggest that the court mistakenly believed that it was required to start its consideration of the active term of imprisonment in the middle of the presumptive range, and the court therefore imposed ten years to serve because it believed that was the default active term of imprisonment for the typical offender committing the typical second-degree sexual assault. Other comments, however, suggest that the trial court had a proper understanding of the presumptive sentencing framework, and the court sentenced Martinez to an active term of imprisonment in the middle of the presumptive range because the court agreed with the State that Martinez's case was atypically serious because of his status as a taxi cab driver.

Because the record is ambiguous, we conclude that a remand is required for clarification of the court's basis for the sentence and, if appropriate, a resentencing.

*Martinez's challenge to his probation condition*

As part of Martinez's sentence, the trial court imposed a number of special probation conditions. Special Probation Condition No. 8 provides:

> The probationer shall, if decided appropriate by his probation officer and sex offender treatment provider, enter and successfully complete any other Department-approved programs, including but not limited to substance abuse treatment and domestic violence programming. The

---

[34] (...continued) criteria — a determination that is ultimately reviewed on appeal under the deferential "clearly mistaken" standard of review. *See Morrissette v. State*, 524 P.3d 803, 807-08 (Alaska App. 2023) (explaining the different roles of trial courts and appellate courts with regard to criminal sentencing); *cf. Smith v. State*, 691 P.2d 293, 295 (Alaska App. 1984) ("[I]t is only in instances where the court's remarks afford no insight to its reasons for sentencing or where they affirmatively indicate that its sentence was not properly grounded on the *Chaney* goals that failure to address the goals expressly will require a remand." (citations omitted)).

probationer shall sign releases of information to enable other programs to exchange verbal and written information with the probation officer and sex offender treatment provider. The probationer shall, if determined necessary by an appropriate mental health or substance abuse professional, enroll in a residential mental health or substance abuse program for a length of time determined necessary by the appropriate professionals. The probationer shall also comply with use of medications prescribed as part of the treatment program.

On appeal, Martinez argues that the provision requiring him to "comply with use of medications prescribed as part of the treatment program" should be vacated because nothing in the record supports the need for Martinez to be subject to such a broad medication mandate. The State concedes that the sentencing court failed to apply the proper analysis and argues that the case should be remanded so that the court can apply special scrutiny and determine whether the condition is justified. The State also concedes that, if the court determines that the medication provision is justified under special scrutiny, the condition should be reworded to include an appropriate judicial review process. We find the State's concessions well-founded, and therefore vacate this condition and remand it for reconsideration.[35]

Because we are remanding this condition, we note another problem with the condition. Although the probation condition expressly states that Martinez may have to enroll in *residential* treatment, the court failed to specify any period of time for the residential treatment. But the law is well-settled that when a probation condition requires a defendant to attend residential treatment, the court must specify the maximum period

---

[35] *See Marks v. State*, 496 P.2d 66, 67-68 (Alaska 1972) (requiring an appellate court to independently evaluate any concession of error by the State in a criminal case).

of custodial treatment.[36]  Moreover, once a sentence has been imposed, the court generally cannot "correct" such a mistake on remand, because doing so constitutes an illegal increase in the defendant's sentence in violation of the prohibition against double jeopardy.[37]  Accordingly, on remand, the court shall strike the portion of the probation condition that requires the treatment to be "residential."

### Conclusion

For the reasons explained above, we AFFIRM Martinez's conviction.  We REMAND this case to the superior court so that it may clarify the basis for Martinez's sentence and, if appropriate, conduct a resentencing.  We also VACATE Special Probation Condition No. 8, and instruct the superior court on remand to apply special scrutiny to the medication mandate and to strike the invalid residential treatment language.  We retain jurisdiction.

---

[36]  *Christensen v. State*, 844 P.2d 557, 558 (Alaska App. 1993); *Galindo v. State*, 481 P.3d 686, 690 (Alaska App. 2021); *see* AS 12.55.100(c) ("A program of inpatient treatment . . . may not exceed the maximum term of inpatient treatment specified in the judgment.").

[37]  *Christensen*, 844 P.2d at 558-59.